Date: ——————————.

FIRST SAVINGS AND LOAN ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 86307, 92918. Filed June 4, 1963.

*Joe W. Magee*, for the petitioner.

*Glen W. Gilson II*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1956, 1957, and 1958 in the respective amounts of $6,054.45, $3,591.86, and $2,715.07. By amended answers respondent asserts a claim for increased deficiencies for 1957 and 1958 in the respective amounts of $7,628.41 and $13,211.32.

The issues for decision are (1) whether, in the years in question, certain "optional share" accounts should be treated as "deposits or withdrawable accounts" in computing deductible additions to petitioner's reserve for bad debts under section 593 of the Internal Revenue Code of 1954; (2) whether any deficiency which may be determined to be due for any year may be accrued by petitioner to diminish undivided profits existing at the beginning of the succeeding year for the purpose of computing the addition to the reserve for bad debts for such succeeding year under section 593; and (3) whether certain profits from real estate transactions are taxable to the petitioner.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a Mississippi corporation which has been engaged since April 1, 1952, in a savings and loan business with related activities in Meridian, Miss. Its president from the time of its organization has been C. D. Shields. It maintains its books and records and files its income tax returns on an accrual method of accounting. During the years in question it filed its income tax returns with the district director of internal revenue at Jackson, Miss.

The petitioner accepts deposits, pays interest thereon, and lends these funds out on the security of mortgages and deeds of trust. In order to expand its business it adopted the practice of making loans to homeowners who already had first mortgages outstanding on their homes, but nevertheless had substantial equities therein. However, in such instances, for the purpose of complying with an implication under the laws of Mississippi that a savings and loan association is prohibited from lending money with second mortgages as security, it developed a method of making such loans by the use of "optional shares" in lieu of taking second mortgages. Under this method the petitioner would make a cash loan to the homeowner in an amount not exceeding the excess of the fair market value of the home over the existing mortgage. Petitioner would take a promissory note and a new mortgage from the homeowner in the total amount of the existing mortgage, plus the amount of the current loan. The amount of the original mortgage would be entered on the books of the petitioner as the amount of the "optional shares." The homeowner would then make monthly payments to the petitioner sufficient to cover both the payments required by the original mortgage, plus payments to discharge the loan he had obtained from the petitioner. The petitioner in turn would remit to the original mortgagee the monthly payment on the original mortgage, and would correspondingly reduce the amount of the optional share account.[1]

---

[1] It has been stipulated that the following example illustrates the foregoing:

Assume a homeowner, A, has a home valued at $10,000 with an existing mortgage of $5,000 to B, and A desires to borrow an additional $1,000. A would execute a new mortgage to petitioner for $6,000, and the following entries would be made on petitioner's books:

| | Debit | Credit |
|---|---|---|
| Mortgage loan, A | $6,000 | ---- |
| Cash | ------ | $1,000 |
| Optional shares (for A) | ------ | 5,000 |

Assume further that the monthly payment on the original mortgage was $80 and that a monthly payment of $20 is required to discharge the additional loan. When A remits his $100 monthly payment to petitioner, the following entries are made:

| | Debit | Credit |
|---|---|---|
| Cash from A | $100 | ---- |
| Mortgage loan, A | ---- | $100 |
| Optional shares (for A) | 80 | ---- |
| Cash to B | ---- | 80 |

On its books the petitioner treated the transaction as if it had loaned the homeowner the amount due under the original mortgage and as if he in turn had deposited such amount with the petitioner. A deposit slip was filled out in the amount due under the original mortgage. (In the example presented in evidence the deposit slip shows the "deposit" to have been received from the original mortgagee rather than from the mortgagor.) Interest was charged to the howeowner (at 6 percent in the example) on both the amount actually loaned by the petitioner and the amount of the original mortgage, and interest was credited on petitioner's books to the homeowner on the amount of the original mortgage (the rate being 4½ percent in the example presented in evidence). In addition to earning interest on the actual loan of cash, the petitioner generally would earn approximately 1 percent on the original mortgage, due to the difference between interest charged by petitioner on the new mortgage (which as shown above includes the amount of the original mortgage) and the interest remitted on the original mortgage.

In the agreement between the petitioner and the homeowner, it was provided that the mortgagee, the petitioner, might pay any part or all of the indebtedness to the original mortgagee. It was further provided that the mortgagor might pay any amount he desired on the mortgage or deed of trust given to the petitioner and that at such time as the amount should be reduced to an amount equal to that due the mortgagee under the original mortgage, then the mortgagor might request cancellation of the mortgage or deed of trust given to the petitioner upon reassuming the payments due under the original mortgage.

In no case did the petitioner assume the original mortgage, and apparently in no case did it elect to pay off the amount of the original mortgage.

The balance sheets attached to the petitioner's income tax returns for the taxable years 1956, 1957, and 1958 showed total deposits or withdrawable accounts of its depositors at the close of each of such years in the respective amounts of $1,258,492.10 (which included $225,704.36 of optional share accounts), $1,530,603.55 (which included $294,107.08 of optional share accounts), and $1,852,282.88 (which included $333,505.74 of optional share accounts). It has been stipulated that such balance sheets erroneously include in optional share accounts for those years the respective amounts of $16,035.58, $19,657.37, and $7,978.61.[2]

---

[2] On brief the respondent states that the overstatement of the amount of optional share accounts for 1958 has already been taken into account in determining the deficiency for the taxable year 1958.

Petitioner's general ledger reflects entries for a "legal reserve," which was its reserve for bad debts, as follows:

| Year | Debit | Credit | Balance |
|------|------:|-------:|--------:|
| 1952 | 0 | $3,496.42 | $3,496.42 |
| 1953 | 0 | 19,221.43 | 22,717.85 |
| 1954 | 0 | 32,853.57 | 55,571.42 |
| 1955 | 0 | 46,856.23 | 102,427.65 |
| 1956 | 0 | 40,488.37 | 142,916.02 |
| 1957 | 0 | 37,617.92 | 180,533.94 |
| 1958 | $2,745.69 | 43,881.35 | 221,669.60 |
| 1959 | 3,623.83 | 36,334.04 | 254,379.81 |
| 1960 | 100.00 | 24,630.67 | 278,910.48 |

The petitioner showed no surplus or undivided profits in its balance sheets at any time during the years in question.

In its income tax returns for the taxable years 1956, 1957, and 1958 the petitioner reported no taxable income and no tax due.

In its return for 1956 the petitioner showed taxable income, without regard to any deduction of an addition to its reserve for bad debts, of $40,488.37. Such net income was offset by the addition of an equal amount to its reserve for bad debts, pursuant to section 593 of the Internal Revenue Code of 1954, on the ground that such amount was less than the amount by which 12 percent of its total deposits or withdrawable accounts of its depositors at the end of the year exceeded the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year. In the notice of deficiency the respondent determined the petitioner's taxable income for the taxable year 1956 to be $20,181.49, by disallowing that amount of the claimed addition to its reserve for bad debts.

In its return for 1957 the petitioner showed taxable income, without regard to any deduction of an addition to its reserve for bad debts, of $37,617.92. Such net income was offset by the addition of an equal amount to its reserve for bad debts. The respondent determined the petitioner's taxable income for that year to be $11,972.87, by disallowing that amount of the claimed addition to its reserve for bad debts, on the same grounds as for the taxable year 1956.

In its return for the taxable year 1958 the petitioner showed taxable income, without regard to any deduction of an addition to its reserve for bad debts, of $43,881.35. Such net income was offset by the addition of an equal amount to its reserve for bad debts. The respondent determined the petitioner's taxable income for that year to be $9,050.24, by disallowing that amount of the claimed addition to its reserve for bad debts, on the same grounds as for the prior taxable years.

In each of the above instances the respondent, in applying section 593 of the Internal Revenue Code of 1954 in determining the proper amount of petitioner's addition to its reserve for bad debts, excluded from total deposits or withdrawable accounts of petitioner's depositors

at the close of each year the amount which the petitioner had included therein on account of "optional shares."

By amended answers the respondent made claim for increased deficiences of $7,628.41 and $13,211.32, respectively, for the taxable years 1957 and 1958 on the ground that the amounts allowed in the deficiency notices for those years as additions to the reserve for bad debts should be decreased in the respective amounts of $20,181.49 and $32,154.36. His stated reason was that in the notices of deficiency he had failed to take into account the undivided profits at the beginning of each of those years.

In order to expand its business further, petitioner engaged in certain real estate transactions during the taxable years 1956, 1957, and 1958 with another corporation, State Guaranty Corp., hereinafter referred to as State Guaranty, and another company, Johnnies Construction Co., hereinafter referred to as Johnnies.

All the stock of State Guaranty was owned by the wife of petitioner's president. It had existed for some years prior to 1955. By its charter as amended in 1955 it was permitted to own and operate a general building, supply, and equipment business, and to operate and conduct such business under any trade name it might designate. Security Building Co. was a name which had been used by the brother of the petitioner's president, and such brother's wife for several years prior to 1956 for conducting a repair business. In 1954 and 1955 such business began to build some houses which the petitioner financed. Johnnies was a business owned by the wife of the brother of petitioner's president, and had been engaged in the construction business.

At the time State Guaranty amended its charter in 1955, there was an agreement among the interested parties that it would take over the Security Building Co. and conduct a repair business and a building business (the latter under the trade name of Security Building Co.), except actual construction work, which construction was to be performed by Johnnies.

During the taxable years 1956, 1957, and 1958 the petitioner owned or acquired title to vacant lots which were suitable for the construction of private homes. An amount equal to the cost of each of these lots was carried on petitioner's books as a loan receivable from Security Building Co. The building of homes on such lots was done by Johnnies, assisted by State Guaranty, with funds of the petitioner. The petitioner set up an account on its books for Johnnies. When each home was completed and sold, the petitioner would credit the account of Johnnies with the actual cost of construction,[3] plus 10

---

[3] The petitioner kept all the paid bills with respect to each house constructed and when the house was completed would review the bills with the homeowner. Johnnies kept no books of account as such, but only vouchers for costs of construction for each house. Shields, the petitioner's president, reviewed all these costs or had them reviewed.

percent. Generally the houses were sold with no downpayment other than closing costs of $250; a 30- or 35-year mortgage was received by petitioner on each house for the full sale price; generally title to the real estate passed directly from petitioner to each respective home buyer; State Guaranty endorsed and guaranteed all notes received by petitioner for the sale of these homes; and the amounts of notes involved for each year were identical to the amounts of the sales price. The notes carried interest at 6 percent per annum.

During the years 1956 and 1957 there was no written agreement between the petitioner and State Guaranty with respect to the construction or financing of homes. The transactions were carried out pursuant to an oral understanding. On January 1, 1956, the petitioner, through its president, addressed a letter to State Guaranty, reading as follows:

This is to confirm our agreement wherein we agree to finance various house construction for you. On any construction loans, the property is to be in our name for security, with your paying interest and fees involved. On the financing of the completed house, you are to endorse and guarantee each note secured by the deed of trust.

It is also agreed that you will leave any prospective profits from same in our Association so that we may have reserve to back up your guarantee.

On January 1, 1958, the petitioner, through its president, addressed a letter to State Guaranty which provided as follows:

Whereas you are in the business of endorsing and guaranteeing the accounts of other corporations and whereas we have been financing the Security Building Company, this is to confirm our agreement wherein you may endorse and guarantee said indebtedness with us and receive the amounts we have heretofore received for the financing of said accounts.

Whereas the houses that we have been financing both temporarily and permanently have increased to the extent that we feel that we must have more equity in said security on the houses so financed, this is to confirm our agreement wherein if you will endorse and guarantee the loans handled by us on new houses during the year 1958, that we will split equally with you the amount of profit received between the cost of construction and the sale price of these houses which has been received by us for the trouble and liability of financing these homes. We will see how this works out for the year 1958 and be able to then determine some permanent basis for handling same, it being further understood and agreed that the receiving of the above amounts for the year 1958 will likewise settle all compensation we may owe to you for prior endorsements and guaranteeing of accounts to our Association, and will also be in full compensation for your services as acting as trustee of the trust fund we have set up for the benefit of our investors.

We regret that business has been such that we haven't been able to pay you for services rendered to date as we should have, but feel that this deal for this year will properly compensate you for all of these services.

The minutes of a joint meeting of the stockholders and the directors of State Guaranty held on January 1, 1958, recite that:

It was voted to confirm the agreement with the First Savings and Loan Association and the Security Building Company wherein the Security Building Company is acting as purchasing agent and is being financed on same through First Savings and Loan Association and upon State Guaranty Corporation endorsing said loans for Security Building Company as share loans, it being understood and agreed that they will receive whatever profits which come from the operation of said purchasing agent's activities after all expenses have been paid.

It was also voted to confirm the agreement with First Savings and Loan Association wherein during the year 1958 said corporation would endorse and guarantee the loans on the new houses financed by First Savings and Loan Association during the year 1958 and for their services in taking this liability they are to receive one-half of the profits received from the temporary and permanent financing of these houses and said amount so received during the year 1958 is likewise to be a settlement in full of all past obligations on the part of State Guaranty Corporation for endorsements to First Savings and Loan Association * * *

In its income tax returns for each of the taxable years 1956, 1957, and 1958 the petitioner reported as income the profits on these sales. The total sales, total costs, and profits for each of the taxable years 1956, 1957, and 1958 were as follows:

| Year | Sales | Petitioner's costs | Petitioners reported profit |
|---|---|---|---|
| 1956 | $88,171.43 | $65,441.86 | $22,729.57 |
| 1957 | 101,486.99 | 73,555.97 | 27,931.02 |
| 1958 | 130,908.09 | 111,908.09 | 19,000.00 |

The amount of sales shown above are identical with the amounts of the notes received by petitioner each year upon the sales. The amount of costs shown above was the amount which petitioner credited to Johnnies for the actual costs of the homes, plus 10 percent. No part of the above profits for the years 1956 and 1957 was ever paid or credited to State Guaranty. For the taxable year 1958, the above figure for costs, $111,908.09, includes an expenditure by petitioner of $19,000 for services of State Guaranty in connection with the houses and endorsing the notes, this amount being one-half of the profit on the houses before payment to State Guaranty, the remaining one-half of the profit, $19,000, being reported by the petitioner in its return. States Guaranty left its $19,000 share of the profits with the petitioner as a fund to secure its guarantee and such amount was credited on petitioner's books to State Guaranty.

In its income tax return for the taxable year 1958 State Guaranty included in its gross income the amount of $19,000 which it received from petitioner for its services in connection with the houses and en-

dorsing the notes. In its income tax returns for the taxable years 1956 and 1957 State Guaranty did not include in its gross income any amount in connection with the houses and endorsing the notes.

Shields, the president of petitioner, is an attorney and acted as such for the petitioner, State Guaranty, and Johnnies. He prepared the income tax returns for the taxable years 1956, 1957, and 1958 for both the petitioner and State Guaranty. No amended returns have been filed by State Guaranty reporting any additional profit from these transactions.

In its petitions, petitioner alleged that the respondent erred in failing to recompute the gain reported on sale of homes for the taxable years 1956, 1957, and 1958. It alleged that in 1956 it sold nine homes for a gross sales price of $88,171.43 represented by downpayments of $2,000 and promissory notes secured by deeds of trust totaling $86,-171.43 with payments extending over approximately 35 years and that the fair market value of such notes did not exceed $63,441.86, resulting in 1956 income being overstated by $22,729.57. It further alleged that in 1957 it sold 10 homes for a gross sales price of $101,486.99 represented by downpayments of $2,305 and promissory notes secured by deeds of trust totaling $99,181.99 with payments extending over approximately 35 years and that the fair market value of such notes did not exceed $71,250.97, resulting in 1957 income being overstated by $27,931.02. It alleged that it did not sell any homes in 1958; that it purchased notes and deeds of trust from the builder/seller at a discount; that the discount on such notes and deeds of trust purchased in 1958 totaled $19,000; and that such amount should be reported as taxable income only in the years during which the notes are collected.

The petitioner was the owner of the homes which were sold in the taxable years 1956, 1957, and 1958 and it, as the seller of the homes, was the owner of the notes for the selling price received from the purchasers.

OPINION

The parties are in accord that the amount of the deduction to which the petitioner is entitled under section 166(c) of the Internal Revenue Code of 1954 as a reasonable addition to its reserve for bad debts is to be determined in accordance with the provisions of section 593 of the Code.[4] They are in disagreement, however, as to the total deposits

[4] Sec. 166 provides in part as follows:

SEC. 166. BAD DEBTS.

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

SEC. 593. ADDITIONS TO RESERVE FOR BAD DEBTS.

In the case of a mutual savings bank not having capital stock represented by shares, a domestic building and loan association, and a cooperative bank without capital stock

or withdrawable accounts of petitioner's depositors within the meaning of section 593 of the Code, the petitioner contending that the amount of "optional share" accounts carried on its books should be included therein, and the respondent contending to the contrary.

We have set forth in some detail in the Findings of Fact the petitioner's method of making further loans to homeowners whose property was already encumbered by first mortgages or first trusts held by other lending institutions. In connection therewith the petitioner set up accounts on its books denominated "optional shares," [5] which in each case was equal to the amount still due under the original first mortgage. The president of petitioner testified that he considered that in these instances the petitioner loaned the homeowner not only the amount of cash advanced, but also an amount equal to the amount due under the original mortgage; that the homeowner in turn deposited with the petitioner, as a pledged savings account, an amount equal to the amount due under the old mortgage; that accordingly these "optional shares" accounts were set up as a liability of the petitioner as in the case of the usual deposit; and that the homeowner could withdraw his account if for any reason the account was worth more than the amount due to the original mortgagee. He conceded, however, that the homeowner could not withdraw the account until he had first satisfied the original mortgage.

The language used in a statute is to be given its ordinary meaning unless otherwise provided. *Hanover Bank* v. *Commissioner*, 369 U.S. 672; *Crane* v. *Commissioner*, 331 U.S. 1; and *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552. There is no reason to believe that Con-

---

organized and operated for mutual purposes and without profit, the reasonable addition to a reserve for bad debts under section 166(c) shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of—

(1) the amount of its taxable income for the taxable year, computed without regard to this section, or

(2) the amount by which 12 percent of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year.

[5] The use of the term "optional shares" was explained by the petitioner's president as follows: "That name was more or less pulled out of the air, and the word 'optional' was used because we gave both to the Association and to the individual involved an option to withdraw these on certain conditions. Therefore, they were called 'optional.'"

The congressional committee reports under the Revenue Act of 1951, which amended sec. 23(k)(1) of the Internal Revenue Code of 1939 to first incorporate the provisions corresponding to those of sec. 593 of the 1954 Code, support the view that Congress had in mind the ordinary type of deposit made to a building and loan association. See S. Rept. No. 781, 82d Cong., 1st Sess., pp. 22–29, 1951–2 C.B. 458, 473–478; S. Rept. No. 781, Part 2 [Supp.], 82d Cong., 1st Sess., p. 27 1951–2 C.B. 545, 563; and H. Rept. No. 1213, 82d Cong., 1st Sess., p. 73 1951–2 C.B. 622, 627. In the first cited report it was stated that building and loan associations secure their funds through deposits, which are known as "shares."

gress in enacting section 593 of the Code employed the terms "deposits," "depositors," and "withdrawable accounts" in any sense other than their conventional meaning. The word "deposit" is defined in Webster's New International Dictionary (2d. ed. 1958) as "That which is placed anywhere or in any one's hands, for safekeeping; something entrusted to the care of another; esp.: *a* Money lodged with a bank or banker, subject to order, and creating the relation of creditor and debtor." In this connection we note that section 1.593–1(d)(3) of the Income Tax Regulations provides that the phrase "total deposits or withdrawable accounts" means the aggregate of amounts placed with an institution for deposit or investment and earnings outstanding on the books of account of the institution at the close of the taxable year which have been credited as dividends upon such accounts. We think such regulation properly defines the term used in the statute.

In the type of transaction here under consideration the homeowner actually made no deposit with the petitioner. The petitioner's cash position was unchanged after the transaction except to the extent it was diminished by the amount of the cash loan disbursed to the homeowner. The account set up by the petitioner on its books as "optional shares" did not in reality represent an account withdrawable by the homeowner. The homeowner was not free to draw against this account. While the petitioner's president testified that the homeowner could withdraw the account when the obligation under the original mortgage was satisfied, it is clear that the arrangement contemplated that there would be nothing to withdraw at such time, since the "optional shares" account was to be reduced correspondingly as payments were made in satisfaction of the original mortgage. The substance of the arrangement, to the extent "optional share" accounts were set up, was one whereby the homeowner made his payments on the original mortgage through the petitioner. The petitioner's requirement that the homeowner execute a note and first mortgage in an amount sufficient to cover not only the cash loan actually made but also the amount of the outstanding first mortgage (which petitioner did not assume and on which the homeowner still remained liable) was no more than a formal requirement designed to comply with the implication of the law of Mississippi against the making of loans secured by second mortgages.

We conclude that for purposes of computing a reasonable addition to the petitioner's reserve for bad debts under section 593 of the Code, the "optional shares" accounts are not to be considered as deposits or withdrawable accounts of its depositors.

The respondent affirmatively alleges that the additions to the reserve for bad debts which he allowed in the notices of deficiencies for

the taxable years 1957 and 1958 should be decreased because he failed to take into account the undivided profits at the beginning of each of those years. It seems apparent that he has reference to the undivided profits which will result from his determination that the petitioner had taxable income for each of the taxable years 1956 and 1957. We think it clear that to the extent the recomputation under Rule 50 discloses taxable income for those years, such taxable income must be treated as undivided profits of the petitioner as of the beginning of each of the succeeding years for purposes of computing the proper addition to the reserve for bad debts under section 593. It may be added that the petitioner apparently does not disagree with this contention of the respondent, since no mention is made thereof on brief. The petitioner does contend, however, that should this Court find that deficiencies in tax are due for the taxable years 1956 and 1957, such deficiencies should be taken into account to reduce its surplus and undivided profits as of the beginning of the taxable years 1957 and 1958, for purposes of application of section 593 of the Code. It is its position that since its books are kept and its returns are filed on an accrual method of accounting, the taxes for each of the years 1956 and 1957 accrued at the end of each of those years and hence reduced earnings and profits.

We think this contention of the petitioner is without merit in view of the decision in *Security Mills Co.* v. *Commissioner*, 321 U.S. 281, in which the Supreme Court, relying upon *Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516, stated:

It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting. * * *

It may be added that section 1.593–1(d)(2) of the Income Tax Regulations provides that the phrase "surplus, undivided profits, and reserves" as used in the statute means "the amount by which the total assets of an institution exceed the amount of the total liabilities," and that "total liabilities" means "all liabilities of the taxpayer which are fixed and determined, absolute and not contingent." Here as of the beginning of each of the taxable years 1957 and 1958 the petitioner clearly was denying liability for any income taxes for the taxable years 1956 and 1957.

During the taxable years 1956, 1957, and 1958 the petitioner took title to various real estate lots and furnished the money for constructing homes thereon. The actual construction was done by another company, Johnnies, which received as its compensation 10 percent of the construction costs. When the homes were sold the petitioner executed the deeds to the purchasers and received notes and

mortgages directly from the purchasers. In its returns for the taxable years 1956 and 1957 the petitioner included in gross income the full amount of profit from such sales. In its return for the taxable year 1958 it included one-half the profit upon the sales, paying State Guaranty one-half of the profit in consideration of the guarantee of the notes and mortgages by that company. In its petitions the petitioner asserted that it was in error in including these amounts as income in each of the years in question. Therein it states that although it did sell the homes in 1956 and 1957, the cash and fair market value of the notes received did not exceed the cost of the homes and that therefore there was no gain realized on the transactions in those years; and that it did not sell homes in 1958, but merely purchased notes and deeds of trusts from the builder/seller at a discount, and that such discount would be realized income only in later years.

On brief the petitioner contends that one-half of the profits on real estate transactions in 1956 and 1957 belonged to State Guaranty, which amount was included in petitioner's income in error, and that the other one-half of the profits for those 2 years constituted discount on the purchase of notes which was not earned, and hence is not taxable income in those years.

It is the petitioner's contention that although it took deeds to the properties in question, this was done for the purpose of security, that in reality it was State Guaranty which built and sold the homes, and that the substance of the transaction was that it purchased the notes from State Guaranty, at a discount, the cost thereof being the amounts which the petitioner had paid for the land and construction, including the fee to Johnnies. In this connection C. D. Shields, the president of the petitioner, testified that the petitioner did not build the homes in any of the years in question,[6] that State Guaranty built them, that the petitioner was handling the financing for one-half of the profit State Guaranty could make, and that the other one-half of the profit belonged to State Guaranty but was left with the petitioner as a reserve fund to secure State Guaranty's endorsement of the notes received upon the sale of the homes. He testified that there was no written agreement in existence in 1956 and 1957, but that there was an oral understanding to the above effect.

We have given careful consideration to this testimony of the petitioner's president, but in the light of his testimony as a whole, and the other evidence of record, we think it must be concluded, and we have found as a fact, that the petitioner was the owner of the homes which

[6] He testified that the petitioner, as a savings and loan association, did not have the right to engage in building activities, and that neither the income tax returns nor the report to the State auditor reveal petitioner's owning any real estate, but that, rather, the petitioner carried the cost of real estate to which it held legal title as a loan receivable.

were sold in each of the years in question, and that upon the sale of the homes it received, as the seller, the notes given by the buyers in payment thereof. We do not consider the letter of January 1, 1956, quoted in the Findings of Fact, as establishing that State Guaranty was the owner of the homes or that such company was entitled to any part of the profit from the sales of homes in 1956 and 1957. The fact is that the petitioner kept all the profit on the transactions in those years. It neither paid nor credited any portion of such profits to State Guaranty. The fact that the petitioner included the full amount of the profits for those years in its income tax returns is, we think, good evidence that the petitioner considered that it owned all the profits. Furthermore, Shields in answer to the question whether petitioner had a liability to State Guaranty at the end of 1956 and 1957 for a share of the profits up to that time, stated that "I did not think so then, but I realize now that we did." It may be further pointed out that the letter of January 1, 1958, from petitioner to State Guaranty, and the minutes of a meeting of the stockholders and directors of State Guaranty held on January 1, 1958, both of which are set forth in the Findings of Fact, recognize that no portion of the profits of those 2 years would be paid to State Guaranty, but that the arrangement made for 1958 for splitting the amount of profit on transactions consummated in 1958, would constitute a settlement of all compensation owed by petitioner to State Guaranty for any prior endorsements and guaranteeing of accounts. We view the situation existing in 1958 as the same as that existing in 1956 and 1957 with the exception that the arrangement for 1958 makes it clear that one-half of the profit on the sale of houses was to be received by State Guaranty. Thus, in the letter of January 1, 1958, the petitioner stated to State Guaranty "if you will endorse and guarantee the loans handled by us on new houses during the year 1958, we will split equally with you the amount of profit received between the cost of construction and the sale price of these houses which has been received by us for the trouble and liability of financing these homes." For 1958 the petitioner reported only one-half of the profit, in view of the fact that it paid one-half of the profit to State Guaranty, and the respondent does not contend that the petitioner is taxable upon any greater amount than was included in its return for that year.

In view of the foregoing, we cannot agree with the petitioner's contention that the transactions, in effect, amounted to the purchase by it, at a discount, of notes received by State Guaranty upon the sale by such company of the houses in any of the years in question, with the result that any profit to petitioner should be treated as profit upon the purchase of notes and taxable only in later years when earned.

There remains for consideration the contention of the petitioner that no income was derived in any of the taxable years because the amount of cash and the fair market value of the notes received did not exceed the cost of the properties to petitioner, relying upon section 1001(b) of the Internal Revenue Code of 1954. The petitioner points to the fact that in most instances no downpayment was made by the purchasers of homes, and the petitioner's president testified that hence the homeowners had little or no equity in the homes, and that in effect he would not consider it good business practice to loan more than 80 percent of the purchase price of a home.

Section 1001(b) of the Code provides that the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. However, an accrual basis taxpayer does not treat an unconditional right to receive money as property received, but rather as money received to the full extent of the face value of the right.[7] See *Key Homes, Inc.*, 30 T.C. 109, affirmed per curiam (C.A. 6) 271 F. 2d 280. The fact that there is always the possibility that a purchaser or debtor may default in his obligation is not sufficient to defer the accruing of income that has been earned. *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182. In any event, the petitioner has not shown that the notes, which carried interest at 6 percent per annum, which were secured by first mortgages or first deeds of trust, and which were endorsed and guaranteed by State Guaranty, did not have a fair market value equal to their face amounts.

On brief the petitioner makes the statement that if we should hold that it is required to include in its income the profit from sales of homes, it should have a substantial reserve for bad debts inasmuch as the loans on the houses were made on virtually a 100-percent loan basis. The petitioner did not by its pleadings or at the hearing advance the contention that it was entitled to any greater addition to its reserve for bad debts than is provided for by section 593. In any event it has not proven that its reserve, so computed, is not adequate to cover any losses which might be sustained on the notes in question.

It is our conclusion that the petitioner properly reported as income in each of the years in question the profit realized upon the sale of the homes.

*Decisions will be entered under Rule 50.*

---

[7] The petitioner, not having elected to use the installment method provided by sec. 453 of the Internal Revenue Code of 1954, must account for the full amount of profit on sales in the year of sale.