738

RICHMOND HILL SAVINGS BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

COLLEGE POINT SAVINGS BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5777–69, 141–70.   Filed March 13, 1972.

*William F. Chapman,* for the petitioners.
*Powell W. Holly, Jr.,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioner Richmond Hill Savings Bank for the calendar year 1965 in the amount of $18,716.93, and petitioner College Point Savings Bank for the calendar year 1966 in the amount of $15,046.57.

The issue for decision is whether in determining the reserve for bad debts for the years in issue under section 593(b)(3), I.R.C. 1954,[1] petitioners' stated "qualifying real property loans," as defined in section 593(e) must be reduced by the amount of mortgagors' escrow deposits held by petitioners for the payment of taxes and insurance.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Richmond Hill Savings Bank, a mutual savings bank whose principal office was located at Richmond Hill, New York, at the time of filing its petition in this case, filed its Federal income tax returns for the calendar years 1965 and 1966 with the district director of internal revenue for the Brooklyn District of New York.

---

[1] All references are to the Internal Revenue Code of 1954.

Petitioner College Point Savings Bank, a mutual savings bank whose principal office was located at College Point, New York, at the time of filing its petition in this case, filed its Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue for the Brooklyn District of New York.

Petitioners are under the supervisory control of the New York State Banking Department. Both petitioners are members of the Federal Deposit Insurance Corporation and are therefore subject to the regulations promulgated by that agency.

Petitioners made loans secured by real estate in the normal course of their businesses during the taxable years in issue. The mortgage loan instruments used by petitioners required the mortgagors as "additional security" to make advance payments to petitioners to provide for the payment of real estate taxes, special assessments, and insurance premiums as these items came due.

The mortgage instruments used by petitioners provided that monthly payments made by the mortgagor would be applied to the following items in the order set forth:

(1) ground rents, taxes, assessments, water rates, fire and other hazard insurance premiums,
(2) interest,
(3) amortized principal.

In addition the mortgage instruments provided that any deficiency in the aggregate monthly payment shall, unless made good by the obligor prior to the due date of the next payment, constitute a default.

In the case of conventional and G.I. mortgage loans made by petitioner Richmond Hill Savings Bank, the mortgage instrument provided in part:

That in order more fully to protect the security of this mortgage, together with, and in addition to, the monthly payments of principal and interest payable under the terms of the bond secured hereby, the Mortgagor will pay to the Mortgagee on the first day of each month until the said bond is fully paid, the following sums:

(a) A sum equal to the ground rents, if any, and the taxes and special assessments next due on the premises covered by this mortgage, plus the premiums that will next become due and payable on policies of fire and other hazard insurance on the premises covered hereby (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust but nevertheless without interest, to pay said ground rents, premiums, taxes and special assessments, before the same become delinquent.

(b) all payments mentioned in the preceding subsection of this paragraph and all payments to be made under the bond secured hereby, shall be added together and the aggregate amount thereof shall be paid by the Mortgagor each

month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i) ground rents, taxes, assessments, water rates, fire and other hazard insurance premiums;

(ii) interest on the bond secured hereby; and

(iii) amortization of the principal of said bond.

In the case of conventional and G.I. mortgage loans made by petitioner College Point Savings Bank, the mortgage instrument provided in part:

The obligor hereby agrees that in addition to the monthly payments of principal and interest payable under the terms of the bond secured by said mortgage, he will pay to the obligee on the first day of each month until the said bond is fully paid, an installment of the taxes and assessments levied against or to be levied against the premises covered by the mortgage. Such installments shall be equal respectively to the estimated taxes and assessments next due (as estimated by the obligee) less all installments already paid therefor, divided by the number of months that are to elapse before one month prior to the date when such taxes and assessments will become delinquent.

The obligee shall hold such monthly payments in trust (without interest) to apply the same against such taxes and assessments before same become delinquent, with the right, however, to the obligee to apply, after default, any sums so received on account of interest or principal in default. Any deficiency in the amount of any such aggregate monthly payment shall, unless made good by the obligor, prior to the due date of the next such payment, constitute a default under the mortgage.

If the total of the payments made by the obligor shall exceed the amount of payments actually made by the obligee for taxes and assessments as the case may be, such excess shall be credited annually by the obligee on subsequent payments to be made by the obligor. If, however, the monthly payments made by the obligor shall not be sufficient to pay taxes and assessments when the same shall become due and payable, then the obligor shall pay to the obligee any amount necessary to make up the deficiency on or before the date when payment of such taxes and assessments shall be due.

In the case of Federal Housing Administration insured mortgage loans, the mortgage instrument used by petitioners provided in part:

That in order more fully to protect the security of this mortage, together with, and in addition to, the monthly payments of principal and interest payable under the terms of the bond secured hereby, the Mortgagor will pay to the Mortgagee on the first day of each month until the said bond is fully paid, the following sums:

(a) An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this instrument and the bond secured hereby are insured, or a monthly charge (in lieu of a mortgage insurance premium) if they are held by the Federal Housing Commissioner, as follows:

(i) If and so long as said bond of even date and this instrument are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one (1) month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Federal Housing Commissioner pursuant to the National Housing Act, as amended, and applicable Regulations thereunder; or

(ii) If and so long as said bond of even date and this instrument are held by the Federal Housing Commissioner, a monthly charge (in lieu of a mortgage insurance premium) which shall be in an amount equal to one-twelfth ($\frac{1}{12}$) of one-half ($\frac{1}{2}$) per centum of the average outstanding balance due on the bond computed without taking into account delinquencies or prepayments;

(b) A sum equal to a ground rents, if any, and the taxes and special assessments next due on the premises covered by this mortgage, plus the premiums that will next become due and payable on policies of fire and other hazard insurance on the premises covered hereby (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one (1) month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent; such sums to be held by Mortgagee in trust to pay said ground rents, premiums, taxes, and special assessments, before the same become delinquent; and

(c) All payments mentioned in the two preceding subsections of this paragraph and all payments to be made under the bond secured hereby shall be added together and the aggregate amount thereof shall be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i) premium charges under the contract of insurance with the Federal Housing Commissioner, or monthly charge (in lieu of mortgage insurance premium), as the case may be;

(ii) ground rents, taxes, assessments, water rates, fire and other hazard insurance premiums;

(iii) interest on the bond secured hereby; and

(iv) amortization of the principal of said bond.

Any deficiency in the amount of any such aggregate monthly payment shall, unless made good by the Mortgagor prior to the due date of the next such payment, constitute a default under this mortgage. In the event that any payment shall become overdue for a period in excess of fifteen (15) days, a "late charge" of two cents (2 cents) for each dollar ($1) so overdue may be charged by the holder hereof for the purpose of defraying the expense incident to handling such delinquent payment.

The advance payments received by petitioners to be held for the payment of real estate taxes, special assessments, and insurance premiums are credited to individual mortgagor's escrow accounts maintained by petitioners and are summarized and recorded on petitioners' books and records in liability accounts entitled, "Mortgagor's Deposits" in the case of Richmond Hill Savings Bank and "Mortgage Escrow Account" in the case of College Point Savings Bank.

The funds received and credited to the Mortgagor's Deposit Account or the Mortgage Escrow Account (hereinafter referred to as mortgagor's escrow deposit account) are held by petitioners with their general cash funds. When petitioners make a payment on behalf of the mortgagor for real estate taxes, special assessments, or insurance premiums, each of the petitioners draws its own check on its general cash account in payment of the particular item and debits the mortgagor's escrow deposit accounts.

When a mortgagor's escrow deposit account contains insufficient funds to cover particular items of real estate taxes, special assessments, or insurance premiums, each of the petitioners advances the funds to cover the item. In the event of default, on foreclosure, petitioners would recover their advances by increasing the balance of the mortgagor's account by the amount of the advances.

When a mortgage is fully paid by a mortgagor, the balance of the amount credited to the mortgagor's escrow deposit account may be applied to the mortgage balance or refunded to the mortgagor at his option.

The books and records of petitioner Richmond Hill Savings Bank reflect "qualifying real property loans" in the amounts of $164,193,-632.91 and $172,533,338.89 for taxable years 1965 and 1966, respectively. In addition, the books and records reflect "Mortgagor's Deposits" in the amounts of $1,595,167.24 as of December 31, 1965, and $1,619,127.39 as of December 30, 1966.

The books and records of petitioner College Point Savings Bank reflect "qualifying real property loans" in the amounts of $54,059,416.08 and $56,448,792.69 for the taxable years 1966 and 1967, respectively. In addition, the books and records reflect a balance in the "Mortgage Escrow Account" of $1,047,486.40 as of December 30, 1966, and $1,064,-923.37 as of December 29, 1967.

Petitioner Richmond Hill Savings Bank computed the addition to its reserve for bad debts for the calendar year 1965 as follows:

| | |
|---|---|
| Qualifying real property loans 12/31/65 | $164,193,632.91 |
| 3 percent thereof | 4,925,808.99 |
| Reserve for qualifying real property loans 1/1/65 | 4,342,847.43 |
| Allowable deductions | 582,961.56 |
| Amount claimed | 582,961.56 |

Petitioner Richmond Hill Savings Bank computed the addition to its reserve for bad debts for the calendar year 1966 as follows:

| | |
|---|---|
| Qualifying real property loans 12/31/66 | $172,533,338.89 |
| 3 percent thereof | 5,176,000.16 |
| Reserve for qualifying real property loans 1/1/66 | 4,925,615.44 |
| Allowable deductions | 250,384.72 |
| Amount claimed | 250,384.72 |

Respondent disallowed the deduction from taxable income for additions to the reserve for bad debts by petitioner Richmond Hill Savings Bank to the extent of $47,855.05 for the calendar year 1965, and reduced its claimed net operating loss carryback from the calendar year 1966 of $6,495.78 by $718.80, which amount resulted from a disallow-

ance in part of additions to the reserve for bad debts for the calendar year 1966.

Petitioner College Point Savings Bank computed its additions to its reserve for bad debts for the calendar year 1967 as follows:

| | |
|---|---:|
| Qualifying real property loans 12/31/67 | $56, 448, 792. 69 |
| 3 percent thereof | 1, 693, 463. 78 |
| Reserve for losses on qualifying real property loans after 1967 charges and credits | 1, 545, 670. 13 |
| Allowable addition to reserve for losses on qualifying real property loans | 147, 793. 65 |

Respondent disallowed the deduction from taxable income for addition to the reserve for losses by petitioner College Point Savings Bank, to the extent of $33,330.72, thereby reducing its net operating loss for the calendar year 1967 and its net operating loss carryback to the calendar year 1966 in that amount.

In the case of both Richmond Hill Savings Bank and College Point Savings Bank, respondent's adjustment was explained as resulting from reducing "qualifying real property loans" as shown on the returns by "escrow balance" or "mortgagor deposits" and applying the 3 percent to the reduced amount.

## OPINION

Section 593, as applicable to the years here in issue, provides that any mutual savings bank or domestic building and loan association shall compute its reasonable addition to its reserve for bad debts for the taxable year for the purposes of section 166(c), as therein provided. Section 593(b) provides that the reserve shall consist of a reasonable addition to the reserve for losses on nonqualifying loans plus the amount determined by the taxpayer to be a reasonable addition to the reserve for losses on qualifying real property loans not to exceed the amount determined under paragraphs (2), (3), or (4) of section 593(b), whichever amount is largest. Section 593(b)(3) provides one of the methods of determining addition to the reserve for losses on qualifying real property loans. The method there provided, which is the method selected by petitioners in this case, is for an addition to the reserve for losses on qualifying real property loans in an amount necessary to increase the balance in that reserve to 3 percent of the qualifying real property loans outstanding at the close of the taxable year. Section 593(e) defines a qualifying real property loan as any loan secured by an interest in improved real property or secured by an interest in real property to be improved out of the proceeds of the loan excluding, "any loan, to the extent secured by a deposit in or share of the taxpayer." [2]

---

[2] Sec. 593(b)(3)(A) provides as follows:
SEC. 593. RESERVES FOR LOSSES ON LOANS.

The narrow question in issue between the parties in this case is whether the amounts in the mortgagor escrow deposit accounts in the petitioner banks are "a deposit in or share of" petitioners which should be considered as securing the loan.[3]

Respondent takes the position that the mortgagor escrow deposit accounts are "deposits" which "secure" petitioners' mortgage loans within the meaning of section 593(e)(1)(C). Respondent views deposits in the mortgagor escrow deposit accounts as general deposits which create a debtor-creditor relationship between the mortgagee-bank and the mortgagor which in the event of default in payment by a mortgagor could be applied by petitioners to the payment of the principal and interest due on the loan. In support of this view respondent points to the fact that the actual sums attributed to the mortgagor escrow deposit accounts were commingled with petitioners' general cash account, and that the following language was contained in one of the mortgage forms used by College Point Savings Bank:

(b) ADDITION TO RESERVES FOR BAD DEBTS.—

\* \* \* \* \* \*

(3) PERCENTAGE OF REAL PROPERTY LOANS METHOD.—The amount determined under this paragraph for the taxable year shall be an amount equal to the amount necessary to increase the balance (as of the close of the taxable year) of the reserve for losses on qualifying real property loans to an amount equal to—

(A) 3 percent of such loans outstanding at such time, plus

Sec. 593(e) provides as follows:

(e) LOANS DEFINED.—For purposes of this section—

(1) QUALIFYING REAL PROPERTY LOANS.—The term "qualifying real property loan" means any loan secured by an interest in improved real property or secured by an interest in real property which is to be improved out of the proceeds of the loan, but such term does not include—

(A) any loan evidenced by a security (as defined in section 165(g)(2)(C));

(B) any loan, whether or not evidenced by a security (as defined in section 165(g)(2)(C)), the primary obligor on which is—

(i) a government or political subdivision or instrumentality thereof;

(ii) a bank (as defined in section 581); or

(iii) another member of the same affiliated group;

(C) any loan, to the extent secured by a deposit in or share of the taxpayer; or

(D) any loan which, within a 60-day period beginning in one taxable year of the creditor and ending in its next taxable year, is made or acquired and then repaid or disposed of, unless the transactions by which such loan was made or acquired and then repaid or disposed of are established to be for bona fide business purposes.

For purposes of subparagraph (B)(iii), the term "affiliated group" has the meaning assigned to such term by section 1504(a); except that (i) the phrase "more than 50 percent" shall be substituted for the phrase "at least 80 percent" each place it appears in section 1504(a), and (ii) all corporations shall be treated as includible corporations (without any exclusion under section 1504(b)).

[3] See *Commercial Savings & Loan Asso*ciation, 53 T.C. 14, 16 (1969), giving the following history of tax provisions with respect to building and loan associations and mutual savings banks:

"Prior to 1952, domestic building and loan associations were exempt from income tax. In 1951 Congress repealed the exemption and subjected such associations to corporation income tax. At the same time they were allowed a special deduction for additions to bad debt reserves which proved to be so large that they remained virtually tax exempt.[1] This provision, in section 23(k)(1) of the 1939 Code, was carried over in section 593 of the 1954 Code.[2]

"The Revenue Act of 1962 revised section 593 extensively and provides a complex method of computing additions to bad debt reserves of these institutions for taxable years ending after 1962."[3]

(Footnotes omitted.)

The obligee shall hold such monthly payments in trust (without interest) to apply the same against such taxes and assessments before same become delinquent, with the right, however, to the obligee to apply, after default, any sums so received on account of interest or principal in default.

Based on his view of the relationship that existed between the mortgagors and petitioners with respect to the mortgagor escrow deposits, respondent contends that the mortgagor escrow deposit accounts represent "additional security" on the mortgage loans and that the amount of these "deposits" should reduce the amount of qualifying real property loans used in computing petitioners' addition to their bad debt reserve.

Petitioners contend that the mortgagor escrow deposit accounts are deposits for a special purpose and do not "secure" the loan within the meaning of section 593(e)(1)(C). Petitioners assert that the mortgagor escrow deposit accounts are, therefore, not "deposits" which "secure" the loans within the meaning of section 593(e)(1)(C) and should not reduce the amount of qualifying real property loans for purposes of computing the addition to their reserves for losses on loans.

Petitioners contend that since the mortgagor escrow deposits are special deposits or deposits for a specific purpose no debtor-creditor relationship exists between the mortgagor and the mortgagee bank with respect to these "deposits." Petitioners contend that the payments into such accounts are consideration for the contractual obligation of the mortgagee bank to pay out the amounts for a specific, stated purpose, and that the amounts in the hands of the mortgagee bank are impressed with a trust.

The question of whether the mortgagor escrow deposit accounts "secure" petitioners' real property loans within the meaning of section 593(e)(1)(C) is one which is necessarily controlled by the terms of the mortgage instrument and by the applicable State law affecting the relationship of the mortgagor and mortgagee.[4]

---

[4] Respondent has no specific regulations defining "deposits" which "secure" a loan. However, sec. 1.593–11 (a) and (b) (1) and (2) concerning "qualifying real property" loans provides in part as follows:

Sec. 1.593–11. Qualifying real property loan and nonqualifying loan defined.—(a) *Loan defined.* For purposes of this section, the term "loan" means debt, as the term "debt" is used in section 166 and the regulations thereunder. The term "loan" also includes a redeemable ground rent (as defined in section 1055(c)) which is owned by the taxpayer, and any property acquired by the taxpayer in a transaction described in section 595(a). For determination of the amount of a loan, see paragraph (d) of this section.

(b) *Qualifying real property loan defined.*—(1) *General rule.* For purposes of sections 1.593–4 through 1.593–10, the term "qualifying real property loan" means any loan (other than a loan described in subparagraph (5) of this paragraph) which is secured by an interest in qualifying real property. For purposes of this section, the term "real property" means any property which, under the law of the jurisdiction in which such property is situated, constitutes real property.

(2) *Meaning of "secured".* A loan will be considered as "secured" only if the loan is on the security of any instrument (such as a mortgage, deed of trust, or land contract) which makes the interest of the debtor in the property described therein specific security for the payment of the loan, provided that such instrument is of such a nature that, in the event of default, the property could be subjected to the satisfaction of the loan with the same priority as a mortgage or deed of trust in the jurisdiction in which the property is situated.

Petitioners were required by law in the State of New York to include as part of the mortgagor's monthly payment an amount equal to one-twelfth of the yearly real estate taxes, and could include such other amounts needed to pay insurance premiums, school taxes, and water rents which if unpaid would become a lien on the property. N.Y. Banking Law, sec. 235(6)(b) (McKinney 1950). In addition, in the case of FHA-insured loans, petitioners were required to provide for equal monthly payments to be made by the mortgagor to the mortgagee in that amount needed to amortize all taxes, ground rents, special assessments, and fire and other hazard insurance premiums. 12 U.S.C. sec. 1709(b)(7) ; 24 C.F.R. sec. 203.23 (1971).

Examination of the mortgage instruments used by petitioners reveals that amounts paid by the mortgagor each month were specifically designated for the purpose of budgeting the payment of real estate taxes and insurance premiums. The mortgagee was obligated to allocate each monthly payment first to taxes and insurance and then to principal and interest. The mortgagee was obligated to pay the real estate taxes and insurance premiums when due, and did so, notwithstanding a deficiency for those items in the mortgagor's escrow deposit accounts.

Except for the ambiguous language in one mortgage form used by College Point Savings Bank which we quoted heretofore in this opinion, there is nothing in the provisions of the mortgage instruments to indicate that the mortgagor escrow deposit accounts were to be used in any manner to directly secure the loans. We do not construe the phrase, "in order to more fully protect the security of this mortgage," as obligating such escrow deposits as specific security on the mortgage loan. The escrow deposits were an indirect form of security only in that they protected the mortgagee as the preference lien holder from having the specific security (the real property) subjected to liens which would have a preference by operation of law and therefore impair or extinguish such specific security.

Under New York law, a mortgagee merely has a lien on the property which secures a loan. *Barson* v. *Mulligan*, 191 N.Y. 306, 84 N.E. 75 (1908). Where there is a default the mortgagee may either recover on the bond or foreclose on the mortgage. *First Nat. Bank & Trust Co.* v. *Eisenrod*, 32 N.Y.S. 2d 641 (Sup. Ct. 1942) ; *In re Jeroloman*, 6 F. Supp. 430 (S.D.N.Y. 1934). However, where there is an action to foreclose on the mortgage, real estate taxes take priority over the lien of the mortgagee. N.Y. Real Prop. Tax Law, sec. 1132 (McKinney 1960) ; N.Y. Real Prop. Actions Law, sec. 1354 (McKinney 1963).

Respondent argues that the mortgagor escrow deposits herein are general deposits which give rise to a debtor-creditor relationship and that the bank as debtor on the deposits may set off such deposits

against another debt on which it is the creditor. Where deposits are unrestricted they are general and subject to such setoff. Petitioners point out that where deposits are restricted as to use, they are special deposits and no debtor-creditor relationship or right of setoff exists.

New York courts have consistently held that mortgage escrow deposits like those before us which have been lodged with the mortgagee are no longer within the control and jurisdiction of the mortgagor and that the mortgagor has no interest in the moneys as long as any amount is owing on the mortgage note. *Valerio* v. *College Point Savings Bank*, 264 N.Y.S. 2d 343, 48 Misc. 2d 91 (Sup. Ct. 1965); *Central Suffolk Hospital Association* v. *Downs*, 213 N.Y.S. 2d 192 (Sup. Ct. 1961). As stated in *In the Matter of Noel Simon*, 167 F. Supp. 214 (E.D.N.Y. 1958), with respect to a similar loan account "a debtor and creditor relationship did not exist between the owner (bankrupt) and the mortgagee (bank)."

In *Cassedy* v. *Johnstown Bank*, 246 App. Div. 337, 286 N.Y.S. 202, 205 (Sup. Ct. 1936), the court stated:

Ordinarily, a lien or right of equitable set-off would attach in favor of a bank against the securities and moneys of a customer deposited in the usual course of business, but this does not apply when the deposit is made for a special and particular purpose. * * *

* * * When a customer indicates that a deposit is made for a special purpose, the bank, by accepting the deposit, agrees to devote the fund to that purpose. It does not become merged with the general funds of the bank, and, upon failure to devote it to the designated purpose, it must be returned to the depositor. * * *

The New York court, in concluding that the bank by accepting the deposits designated for a special purpose agreed that it would hold the money as a trustee and bailee for that purpose, stated (286 N.Y.S. at 206):

When a trustee mingles property which is subject to the trust with other property so that the identity of the trust property is lost, the combined property is impressed with the trust.

We conclude that the provisions of the mortgage instruments used by petitioners and the applicable law of the State of New York do not support the position taken by respondent herein. Neither the mortgage instruments nor applicable State law lend support to respondent's contentions that the mortgagor escrow deposit accounts created a debtor-creditor relationship between the mortgagor and a bank. These deposits were impressed with a trust and could not, as could a general deposit by a mortgagor with petitioners, be applied in the event of default in payment by the mortgagor to the principal and interest due on the loan.

Section 593(b)(1)(B)(ii) provides that the reserve for losses on qualifying real property loans shall not be greater than an amount

based on certain items added to 12 percent of its "total deposits or withdrawable accounts." The regulations define the term "total deposits or withdrawable accounts" as meaning: "the total of amounts placed with the taxpayer for deposit or investment." Sec. 1.593–6 (f) (3), Income Tax Regs.

Respondent argues that since section 593 (b) (1) (B) (ii) contains a limitation on the additions to the serve for bad debts which is computed in part under section 593 (b) (3) (A), providing for the percentage of real property loans method, the term "deposits" should have the same meaning in both sections. Respondent argues that since section 593 (e) defines "qualifying real property loans" as it is used in section 593 (b) (3) (A), the word "deposits" as it appears in section 593 (e) (1) (C) is synonymous to that word as used in section 593 (b) (1) (B) (ii). Respondent deduces from this that, since mortgagor escrow deposit accounts would be includable in "deposits" as that word is used in the term "deposits or withdrawable accounts" in section 593 (b) (1) (B) (ii), they would likewise be includable in "deposits" as that word appears in section 593 (e) (1) (C).

We do not agree with respondent's analysis of the statute. Section 593 (e) (1) (C) addresses itself to a "loan" which is "secured by a deposit or share in the taxpayer." We need not pass on whether the word "deposits" in section 593 (b) (1) (B) (ii) should be construed to be all-inclusive since the use of the word "deposits" in section 593 (e) (1) (C) is clearly limited to those deposits which secure a loan.[5] As we stated in *First Savings & Loan Association*, 40 T.C. 474, 482, 483 (1963), the words used in section 593 should be given their ordinary meaning.

We, therefore, conclude that the mortgagor escrow accounts did not secure petitioners' qualifying property loans. Since the mortgagor escrow deposit accounts did not secure petitioners' qualifying real property loans, they are not "deposits" which "secure" the loans within the meaning of section 593 (e) (1) (C) and petitioners are not required to reduce the amount of their qualifying real property loans by the balances in such accounts for purposes of computing the addition to the reserves for losses on loans.

Because of an uncontested adjustment,

*Decisions will be entered under Rule 50.*

---

[5] We find it unnecessary to either approve or reject Rev. Rul. 55–435, 1955–2 C.B. 540, cited by respondent to support his position that "mortgagor's escrow deposit accounts" are deposits within the meaning of sec. 593 (e) (1) (C). Rev. Rul. 55–435 sets forth respondent's position that "mortgagor's escrow deposit accounts" constitute deposits within the meaning of sec. 39.23 (k)–5 (b) (2) (iv) of Regs. 118 amplifying sec. 23 (k) (1), I.R.C. 1939 (relating to additions to reserves for bad debts), and that the amounts of such accounts may be included as part of the taxpayer's "total deposits or withdrawable accounts." Sec. 23 (k) (1) of the 1939 Code was the source of sec. 593 (b) (1) (B) (ii) of the 1954 Code. We do not deem Rev. Rul. 55–435 as being interpretive of sec. 593 (e) (1) (C) and therefore need not rule on its validity.