NESTLÉ HOLDINGS, INC. AND CONSOLIDATED SUB-
SIDIARIES, AS SUCCESSOR IN INTEREST TO NESTLE
ENTERPRISES, INC. AND CONSOLIDATED SUBSIDIARIES,
PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 24080-88.          Filed June 6, 1990.

*Joel V. Williamson, William A. Schmalzl, Thomas C. Durham, Alexander Spitzer, Gary P. Kirschenbaum, Joseph R. Goeke,* and *Gregory L. Barton,* for the petitioner.

*Theodore J. Kletnick, Sharon Katz-Pearlman,* and *Jeannette D. Schmelzle,* for the respondent.

## OPINION

GOFFE, *Judge:* The case is presently before us on cross-motions for partial summary judgment under Rule 121(b).[1] There is no genuine issue as to any material fact with respect to the question presented.

The Commissioner determined the following deficiencies in, and additions to, petitioner's Federal income taxes:

| TYE | Deficiency | Addition to tax Sec. 6661 |
| --- | --- | --- |
| July   2, 1977 | $929,112 | --- |
| June 30, 1979 | 5,268,805 | --- |
| Jan.   3, 1981 | 16,138,544 | --- |
| Jan.   2, 1982 | 191,523 | --- |
| Jan.   1, 1983 | 15,959,638 | $3,989,910 |

---

[1]Unless otherwise indicated, all Rule references are to the Rules of Practice and Procedure of this Court, and all section numbers refer to the Internal Revenue Code in effect for the taxable years in issue.

The issue presented by the motions is the amount realized by a taxpayer on the accrual method of accounting in a sale under section 1001(b) by receipt of preferred stock having optional and mandatory redemption rights. If the preferred stock is equivalent to money, the redemption price is the amount realized but if the preferred stock is classified as property, its fair market value is the amount realized.

Petitioner Nestlé Holdings, Inc., is a corporation organized under the laws of the State of Delaware. It is the parent corporation of a consolidated group of corporations. During the years in issue, Libby, McNeill & Libby, Inc. (Libby), was a member of petitioner's affiliated group of corporations and it was engaged in the manufacture and sale of canned food products. Libby maintained its books and records on the accrual method of accounting.

In 1981, Libby decided to discontinue certain lines of its canned fruit and vegetable businesses. On March 9, 1982, Libby sold a portion of its canned vegetable inventory to S.S. Pierce Co. (Pierce), a corporation organized under the laws of the State of New York, in exchange for a long-term promissory installment note of Pierce in the amount of $25 million, 1,500 shares of preferred stock of Pierce having a redemption price of $15 million, and a short-term promissory note of Pierce in the amount of $10,707,387. The combined face amounts of the notes and the redemption value of the preferred stock equaled the direct cost of Libby in the inventory that it sold.

The preferred stock had the following rights, preferences, and limitations:

1. *Dividends.* Dividends on the stock were to be paid when and as declared by the board of directors, but only out of surplus legally available for the payment of dividends, at the rate of $500 per share per annum, payable quarterly. The dividends were cumulative, in that if, for any quarter, they were not paid at the $500 per annum rate, the deficiency was to be fully paid before a dividend could be declared on any common stock, or on any other preferred stock of the same or junior parity. However, no dividends were payable on the stock unless dividends had been fully paid on certain other classes of preferred stock.

2. *Optional Redemption.* If dividends had been fully paid on certain other classes of preferred stock, Pierce could redeem all or any part of the preferred stock for $10,000 per share plus any dividend arrearages.

3. *Mandatory Redemption.* Pierce was obligated to redeem the preferred stock on the following terms:

a. As of the first day of each fiscal quarter of Pierce beginning on or after February 1, 1987, Pierce was to calculate and report to the preferred stockholders the ratio of its total shareholders' equity to its average total assets for the preceding 4 fiscal quarters (asset ratio). To the extent that the asset ratio exceeded 30 percent, Pierce was to redeem the preferred stock at the rate of $10,000 per share up to a maximum of $1.5 million for any 4 consecutive quarters. Pierce was also to pay the holders of any redeemed preferred stock any dividends accumulated on it up to the date of redemption. Payments for the redemption and accumulated dividends were to be made within 15 days after the asset ratio reports were due to be mailed.

b. All preferred stock outstanding on March 8, 1992, was to be redeemed, and any dividends accumulated on the stock up to that date were to be paid, at that time.

4. *Voting and Board Representation.* Holders of the preferred stock were entitled to vote as a separate class with respect to:

a. the authorization or issuance of any class or series of stock of the same or senior parity with respect to dividends or liquidating distributions;

b. any change in the preferences and rights of the stock;

c. any change in the preferences and rights of any other class of preferred stock which would cause it to have the same or senior parity with respect to dividends or liquidating distributions; and

d. any merger or consolidation which would have a similar effect.

Whenever an amount equal to 6 full quarterly dividends was in arrears on the stock, its holders were entitled to appoint two extra directors to the board of Pierce.

In calculating its gain or loss from the sale, Libby reported the value of the short-term note at its face value of

$10,707,387, but it reported the long-term note and preferred stock at what Libby determined to be the respective fair market values as follows:

|  | Face/redemption price | FMV determined by Libby | Discount from face/redemption price used in reporting amount realized |
|---|---|---|---|
| Short-term note | $10,707,387 | $10,707,387 | - - - |
| Long-term note | 25,000,000 | 16,400,000 | $8,600,000 |
| Preferred stock | 15,000,000 | 6,100,000 | 8,900,000 |
| Totals | 50,707,387 | 33,207,387 | 17,500,000 |

On its return for the taxable year ending January 1, 1983, petitioner claimed a loss in the amount of $17.5 million (basis, equal to the direct cost of its inventory $50,707,387, less amount realized of $33,207,387). The Commissioner disallowed the loss. Petitioner concedes that Libby should not have discounted the long-term note to fair market value; i.e., it should have included the note at its full face, or $25 million, in calculating the amount realized from the sale of the inventory.

Pierce included the full redemption price of the preferred stock which it issued in calculating its cost of the inventory purchased from Libby.

Later in 1982, Libby sold the long-term note and the preferred stock to petitioner for $22.5 million. In 1983, petitioner sold the note and the preferred stock back to Pierce for the same amount.

Petitioner argues that it should be required to include only the fair market value of the preferred stock of Pierce, rather than its redemption price, in calculating the amount realized from the sale of Libby's inventory. This is so, contends petitioner, because section 1001(b) defines the amount realized from the sale or other disposition of property to be the sum of any money received plus the fair market value of property other than money received, and because preferred stock is property other than money.

Respondent concedes that the preferred stock is property other than money but maintains that, in the case of an accrual method taxpayer, section 1001(b) must be read in conjunction with section 451, which requires that income be

included in a taxpayer's gross income in the taxable year in which the right to receive it becomes fixed and its amount can be determined with reasonable accuracy. This theory has become known as the "all-events test." Sec. 1.451-1(a), Income Tax Regs. Under this principle, argues respondent, Libby, an accrual method taxpayer, should have included the redemption price of the preferred stock, $15 million, in calculating the amount realized because it was entitled to receive at least this amount pursuant to the mandatory redemption feature of the preferred stock by no later than 1992. This would result in no gain or loss being realized from the transaction. The fair market value of the preferred stock is irrelevant, argues respondent, and would be the amount realized if received by a taxpayer on the cash method of accounting. Viewed another way, respondent considers section 1001(b) to be limited to sellers who report their income on the cash method of accounting but overridden by the provisions of section 451 when applied to sellers who report their income on the accrual method of accounting. This position of respondent is also set forth in Rev. Rul. 79-292, 1979-2 C.B. 287.[2] Finally, respondent argues that holding the fair market value of the preferred stock to be the relevant amount will require administratively burdensome determinations of fair market value in every case.

The pertinent portion of section 1001 provides:

SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

---

[2]This ruling holds in part:

The "cash method" tax treatment specified by section 1001(b) * * *, that is, amount realized from sale of property, is the sum of money *received* and the fair market value of property *received*, is appropriate unless the taxpayer's use of a method other than the cash method, for example, accrual method, prescribes a different period or manner for the inclusion of gross income derived from the sale of property. This concept that the provisions of section 1001(b) are subject to the taxpayer's method of accounting is a reiteration, although not specifically set forth in section 1001(b), of the general rule for the taxable year of gross income inclusion presented in section 451(a). The provisions of section 451(a) also require gross income inclusion for the taxable year of receipt "*unless,* under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." [1979-2 C.B. at 288; emphasis in original.]

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

\* \* \* \* \* \* \*

(c) RECOGNITION OF GAIN OR LOSS.—Except as otherwise provided in this subtitle, the entire amount of the gain or loss, *determined under this section,* on the sale or exchange of property shall be recognized. [Emphasis supplied.]

(d) INSTALLMENT SALES.—Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received. * * *

On its face, the statute establishes a general rule for calculating the amount of gain or loss on the sale or other disposition of property and does not, by its terms, distinguish between taxpayers on different methods of accounting. The only reference in the statute to accounting methods is in subsection (d), relating to and approving the installment method of accounting for certain sales, see section 453 et seq. Nothing in the language of the statute requires an accrual method taxpayer to compute the amount realized any differently than a cash method taxpayer—both would appear to be required to add the amount of money and the fair market value of property other than money, received on the sale or other disposition in order to arrive at the amount realized.

Nevertheless, our cases applying section 1001 do differentiate results according to the accounting method employed by the selling taxpayer. In *First Savings & Loan Association v. Commissioner,* 40 T.C. 474 (1963), the accrual method taxpayer acquired lots, built homes on them, and sold the homes and lots, generally for a small downpayment equal to closing costs and a note secured by a first mortgage or first deed of trust on the property sold. The notes were guaranteed by a guaranty company.[3] One of the contentions of the taxpayer was that, under section 1001(b), it received no income from the sales because the cash and

[3]One issue was whether the taxpayer sold or merely financed the sale of the homes. We found that the taxpayer was the true seller and hence reached the issue discussed in the text. *First Savings & Loan Association v. Commissioner,* 40 T.C. 474, 486 (1963).

fair market value of the notes it received was less than its costs of acquiring and constructing the lots and homes.

We rejected this contention, however, stating that in spite of the above-quoted language of section 1001(b),

an accrual basis taxpayer does not treat an unconditional right to receive money as property received, but rather as money received to the full extent of the face value of the right. * * * The fact that there is always the possibility that a purchaser or debtor may default in his obligation is not sufficient to defer the accruing of income that has been earned. * * * [40 T.C. at 487; fn. ref. and citations omitted.]

However, we also observed:

In any event, the petitioner has not shown that the notes, which carried interest at 6 percent per annum, which were secured by first mortgages or first deeds of trust, and which were endorsed and guaranteed by State Guaranty, did not have a fair market value equal to their face amounts. [40 T.C. at 487.]

Likewise, in *Western Oaks Building Corp. v. Commissioner*, 49 T.C. 365 (1968), accrual and cash method taxpayers built and sold homes. The purchasers were frequently unwilling or unable to pay in cash the difference between what the mortgagee would lend and the selling price. The mortgagee was usually a savings and loan association (S&L) which, under State law, could lend no more than 80 percent of the lesser of the selling price or the appraised value. To make a sale possible in such a situation, the S&L took a note and mortgage on the property equal to the difference between the selling price of the home and the amount the buyer was willing to pay down. The S&L then paid in cash to the taxpayer the amount it was willing to lend on the home and delivered to the taxpayer a savings account for the balance of the amount financed. The taxpayer then assigned the account back to the S&L as additional security for the purchaser's mortgage note. Under the terms of the assignment, the funds in the account were to be released to the taxpayer at the rate of $100 for every $200 paid by the purchaser on the principal of the note. While the note was not in default, the S&L paid interest or dividends on the account to the taxpayer at the same rate as holders of other accounts. The amounts of these payments were not related to the purchaser's loan payments. 49 T.C. at 367-368.

The accrual method taxpayers contended that they were not required to include in gross income the face amounts of the savings accounts when received, but only the amounts of the accounts released to them under the assignments, when released. Citing section 451, the all-events test of section 1.451-1(a), Income Tax Regs., and *First Savings & Loan Association v. Commissioner, supra,* we held that the full amounts of the accounts were includable in these taxpayers' income when the sales of the homes took place. 49 T.C. at 370-375. We also discussed a Supreme Court case, *Spring City Foundry Co. v. Commissioner,* 292 U.S. 182 (1934), which held that, when an accrual method taxpayer sells goods on account, it must include the total amount of the accounts receivable in gross income, even if they become uncollectible later in the same taxable year. The Court held:

> Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues * * *

> the accounts receivable arising from the sales, * * * less the cost of the goods sold, figure in the statement of gross income. If such accounts become uncollectible, * * * the question is one of the deduction which may be taken according to the applicable statute. * * * It is not altered by the fact that the claim of loss relates to an item of gross income which had accrued in the same year.

> [292 U.S. at 184-185. Emphasis in original and citations omitted.]

We pointed out that *Spring City Foundry Co.* dealt with the accruability of an account receivable arising from the sale of merchandise when the purchase price was immediately due and payable but the actual payment postponed. However, citing *First Savings & Loan Association v. Commissioner, supra,* we held that even when payment is not due until some time in the future, an accrual method taxpayer not using the installment method must include the amount of the payment in income at the time of the sale, when it acquires the right to receive it. We also held that the face amount of the right, rather than its fair market value, is the amount included in income. 49 T.C. at 372.

Under these principles, we observed that if the accrual method taxpayers had taken second-mortgage notes from the purchasers instead of the restricted accounts from the S&L, the notes clearly would have been includable in these taxpayers' income at face amount in the years of sale. The same would be true if the taxpayers assigned or sold the notes to the S&L subject to the same release restrictions applicable to the accounts. 49 T.C. at 372-373.

We, nevertheless, held that the cash method taxpayers were not required to include any portion of the accounts in income at the time of sale, but only the amounts of the accounts which were released to them, when released. For such taxpayers, according to our opinion, the right to receive a future payment is not includable in the amount realized under section 1001(b) unless it is the equivalent of cash. To qualify, the right must be embodied in notes, mortgages, or other evidences of indebtedness which are like money in that they are freely and easily negotiable and thus readily change hands in commerce. The evidence showed that there were very few sales of accounts of this type and, with the restrictions placed on them, they did not qualify as negotiable instruments under the Uniform Commercial Code. They were thus not readily negotiable. 49 T.C. at 376-377.

Petitioner argues that our opinions are in error in determining the amount realized from a sale based upon the accounting method of the selling taxpayer. According to petitioner's line of reasoning (1) no such distinction appears in the statute—its language defines the amount realized similarly for all taxpayers; (2) reading section 451 in conjunction with section 1001 is mixing apples and oranges in that section 451, as an accounting provision, tells us *when* an item of income is to be included in gross income, whereas section 1001 tells us the *amount* of the item; (3) section 451 cannot apply until we know how much to include in income, which, in the case of a sale, is determined in large part by computing the amount realized; (4) *Spring City Foundry Co. v. Commissioner, supra,* is not inconsistent with this argument, because the issue there was not the fair market value of the receivables at the time of the sales,' but the appropriate accrual accounting treatment

when the receivables became worthless *after the sales* but in the same taxable year; and (5) finally, argues petitioner, requiring an accrual method taxpayer to include in its amount realized the face amount of an obligation rather than its fair market value can distort the true gain or loss upon the disposition. For example, assume that a taxpayer exchanges an asset with a fair market value of $50,000 and a basis of $10,000 for a junk bond with a face amount of $100,000 but a fair market value, based upon trading in securities markets, of $50,000. All the taxpayer has received is $50,000, and his true realized gain *upon the exchange* is $40,000, the increase in the value of the asset since he acquired it. If the taxpayer redeems the bond at maturity for its face amount, he realizes an economic gain *upon the redemption* of $50,000. That is, the value of the bond would have increased in that amount since the exchange. Of course, due to the vagaries of junk bonds, he may not realize anything at maturity or any other time (e.g., the issuing concern goes bankrupt and has no assets to pay the junk bondholders). In that case, he would realize an economic loss *upon the discharge in bankruptcy* of $50,000. That is, the value of the bond would have decreased in that amount since the exchange. Under petitioner's argument, the gains and losses realized pursuant to section 1001 would correspond to these economic gains and losses. Thus, on the exchange, the amount realized under section 1001(b) would be the fair market value of the bond at that time, $50,000. The realized gain would be this amount less the $10,000 basis, or $40,000. The amount realized upon the redemption would be the money received, $100,000, less the taxpayer's income tax basis in the bond, $50,000, for a gain of $50,000. The cases cited above, however, would require the taxpayer, if on the accrual method, to include in the amount realized the entire face amount of the bond and report a gain of $90,000 upon the exchange. If the taxpayer redeemed the bond at maturity for its face amount, no gain would be reported. Similarly, upon the discharge in bankruptcy, the taxpayer would report a loss of $100,000.

We find it unnecessary to pass upon this argument in order to resolve the instant case. Whether our prior cases were correctly decided or not, they do not apply on their

facts to the one before us. *First Savings & Loan* and *Western Oaks Building Corp.* both involved the receipt of evidence of indebtedness—unconditional obligations to pay a sum certain to the holder in the future. Thus, in *First Savings & Loan,* the taxpayer received notes from the purchasers, secured by first mortgages on the homes sold to them. In *Western Oaks,* the taxpayers received savings accounts from a savings and loan association. These constituted indebtedness of the S&L to the taxpayers because such accounts create a debtor-creditor relationship between the financial institution and the account holder. *United States v. Bowery Savings Bank,* 297 F.2d 380, 382, 383 (2d Cir. 1961). The essence of these cases is that, under section 1001(b), "an accrual basis taxpayer does not treat an unconditional right to receive money as property received, but rather as money received to the full extent of the face value of the right." *First Savings & Loan Association v. Commissioner, supra* at 487. However, we are not prepared to extend such a rule to preferred stock. [4] Preferred stock has materially different attributes than debt, the most important of which is that, while debt is an unconditional right to receive a payment of money in the future, regardless of the financial condition of the obligor, *Gilbert v. Commissioner,* 248 F.2d 399, 402 (2d Cir. 1957), preferred stock can only be redeemed if the issuer has adequate capital or equity. Pierce was incorporated under the laws of the State of New York. Under New York law, a holder of preferred stock can never have an unconditional right to have the stock redeemed, because a corporation may only redeem its stock out of surplus. N.Y. Bus. Corp. Law sec. 513 (McKinney 1986). Corporate directors may be held civilly and criminally liable for violations of this rule. Agreement of a corporation to redeem its stock is legal but subject to the statutory limitations. Thus, if a surplus which exists at the time of the agreement disappears, the agreement is rendered unenforceable. *Nakano v. Nakano McGlone Nightingale Advertising, Inc.,* 84 Misc.2d 905, 377 N.Y.S.2d 996, 1000 (Sup. Ct. 1975). Further, preferred stockholders are always subordinate to creditors in receiv-

---

[4]Respondent did not determine nor did he argue that the preferred stock should be recharacterized as debt under sec. 385.

ing liquidating distributions from the assets of the corporation. Thus, under applicable corporate law, a holder of the Pierce preferred stock has no unconditional right to receive all or any part of the redemption price.

We also agree with petitioner that the position of respondent that the preferred stock must be treated as money received is inconsistent with the treatment of this type of stock in other contexts. For example, preferred stock satisfies the continuity of interest requirement of section 368, *John A. Nelson Co. v. Helvering,* 296 U.S. 374 (1935), and respondent has ruled that even preferred stock with a mandatory redemption feature will satisfy such requirement. Rev. Rul. 78-142, 1978-1 C.B. 111. Finally, we have recently distinguished redeemable preferred stock from debt in the context of the gift tax. In *Snyder v. Commissioner,* 93 T.C. 529 (1989), respondent urged us to apply *Dickman v. Commissioner,* 465 U.S. 330 (1984) (holding that interest-free demand loans between related parties result in gifts of the foregone interest), to preferred stock convertible to mandatorily redeemable preferred stock. We held that *Dickman* could not be applied to equity interests in corporations because, unlike debt, they do not entitle the holder to any right to be paid for the use of the capital contributed. The value of this use depends upon how much the corporation earns on the contributed capital and is not objectively quantifiable. However, the value of the use of money lent is quantifiable because the cost of borrowing it can be readily determined based upon market rates of interest. Further, the corporation becomes the owner of the contributed capital, whereas in the case of a loan, the lender in effect retains title to the funds lent due to the obligation of the corporation to repay them. We held that, even if the taxpayer had converted to the mandatorily redeemable preferred stock, *Dickman* still would not have applied because "The existence of her put right [did] not transform her equity interest into debt." *Snyder v. Commissioner,* 93 T.C. at 547.

A final problem we have with extending the definition of "money received" in section 1001(b) to encompass preferred stock is its great dissimilarity to money in any practical sense. Assuming without deciding that the term includes

not only actual money, but "money equivalents" as well, it is difficult to see how stock of any sort could reasonably be viewed as such. We have held that,

in order for an item to qualify as a cash "equivalent," it must be in the nature of money; that is, it must be convertible into cash at face amount as a matter of certainty. * * * [*R.M. Smith, Inc. v. Commissioner*, 69 T.C. 317, 329 (1977), affd. 591 F.2d 248 (3d Cir. 1979), cert. denied 444 U.S. 828 (1979)].

Certainly, preferred stock does not qualify under this practical definition. To be converted into money, it must be sold, and, even if traded on a national exchange, its market value can vary greatly over short periods of time. Indeed, respondent concedes that the preferred stock is not in fact money but property other than money.[5]

Respondent's argument concerning the administrative and judicial burdens resulting from having to value the preferred stock in order to calculate gain or loss is almost too disingenuous to require comment. As must be true of any market-based economy, the concept of fair market value has always been part of the warp and woof of our income, estate, and gift tax laws, and concomitantly the necessity of determining the fair market values of numerous assets for equally numerous purposes has always been a vital and unavoidable function of the tax administrative and judicial process. Further, respondent concedes that fair market value must at the very least be determined in every case of an exchange of property by a *cash method* taxpayer.

We, therefore, hold as a matter of law that redeemable preferred stock received on a sale or other disposition of property is "property (other than money)" for purposes of section 1001(b), regardless of the method of accounting used by the taxpayer, and is to be included in the "amount realized" at its fair market value. Respondent has not conceded that the fair market value of the preferred stock ascribed by Libby ($6,100,000) is correct. It will, therefore, be necessary for the parties to agree upon the fair market value of the preferred stock or submit that question of fact

---

[5]We do not treat this as a concession of the entire case; rather, we interpret respondent's argument to be that even though the preferred stock is not in fact money, under sec. 451 and sec. 1.451-1(a), Income Tax Regs., an accrual method taxpayer should treat preferred stock with a mandatory redemption feature as the equivalent of money.

to the Court for resolution. We will, therefore, grant petitioner's motion for partial summary judgment and deny respondent's motion for partial summary judgment.

To reflect the foregoing,

*An appropriate order will be issued.*