VALERO ENERGY CORPORATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Valero Energy Corp. v. Commissioner
Docket No. 22874-90.
United States Tax Court
T.C. Memo 1994-132; 1994 Tax Ct. Memo LEXIS 140; 67 T.C.M. (CCH) 2526; March 29, 1994, Filed *140 Decision will be entered under Rule 155. Lawrence Sherlock and George A. Hrdlicka, for petitioner. T. Richard Sealy III, for respondent. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in petitioner's 1980 and 1981 Federal income tax in the respective amounts of $ 251,582 and $ 1,342,616. The parties have settled all issues relating to petitioner's 1980 taxable year; after concessions by the parties, the issues for decision with respect to petitioner's 1981 taxable year are: (1) Whether Valero Energy Corp. (Valero) overstated its 1984 net operating loss, for which it apparently received a tentative carryback allowance to 1981, by $ 19,795,972, the amount that it paid in 1984 in satisfaction of an obligation incurred to customers of Lo-Vaca Gathering Co. (Lo-Vaca), [1] a wholly owned subsidiary of Valero, as a result of a 1979 settlement of breach of contract actions that had been filed by the customers against Lo-Vaca, Coastal States Gas Producing Co., [2] and Coastal States Gas Corp.; and (2) whether Valero further overstated its 1984 net operating loss by $ 6,079,028, the amount by which a $ 115 million deduction taken by *141 and allowed to the Coastal States Gas Corp. affiliated group on its 1979 consolidated income tax return exceeded $ 108,920,972, the sum of the $ 19,795,972 payment made by Valero in 1984, and $ 89,125,000, the fair market value of Valero series A preferred stock placed in a settlement trust on December 31, 1979. For the reasons that follow, we hold that petitioner overstated its 1984 net operating loss by the amount of the 1984 payment, $ 19,795,972, but not by any additional amount. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein. Valero and its subsidiaries are an affiliated group of corporations that filed a 1984 consolidated Federal income tax return under sections 1501-1505. [3] Valero *142 is a Delaware corporation that had its principal offices in San Antonio, Texas, when the petition in this case was filed. Valero has always used an accrual method of accounting for Federal income tax purposes. Prior to 1980, Valero, then known as Coastal States Gas Producing Co. (hereinafter Coastal Producing or Valero), was a wholly owned subsidiary of Coastal States Gas Corp. (Coastal). Coastal and its subsidiaries, including Coastal Producing, were an affiliated group of corporations that filed a 1979 consolidated Federal income tax return. Coastal and its subsidiaries used an accrual method of accounting for Federal income tax purposes. During the 1970s, Lo-Vaca, a wholly owned subsidiary of Coastal Producing, operated a gas pipeline system that provided natural gas to municipalities and public utilities in Texas. *143 Lo-Vaca's major customers had long-term contracts, of 10 to 20 years' duration, under which Lo-Vaca was to supply them with natural gas at fixed prices. In the early 1970s, natural gas prices increased substantially, and Lo-Vaca found itself paying more for natural gas than it was receiving from its major customers under these contracts. The rise in natural gas prices prompted Lo-Vaca to try to renegotiate these contracts. Although Lo-Vaca was able to renegotiate some of these contracts, it soon realized that it would not be able to do so with all of them. In March 1973, Lo-Vaca petitioned the Railroad Commission of Texas (Railroad Commission) to increase the rates it could charge its customers. [4]
On September 27, 1973, the Railroad Commission issued *144 an interlocutory order permitting Lo-Vaca to pass on to its customers its increased natural gas costs pending resolution of the case. Lo-Vaca's customers filed suits in Texas courts alleging that Lo-Vaca, Coastal Producing, and Coastal had breached the supply contracts. On December 12, 1977, after more than 4 years of regulatory proceedings and litigation, the Railroad Commission ruled that Lo-Vaca was not entitled to rate relief. In so ruling, the Railroad Commission ordered Lo-Vaca to return to the fixed prices specified in its contracts and to refund to its customers the excess of the rates charged under the interlocutory order over the contract prices. The Railroad Commission further ruled that Coastal, Coastal Producing, and Lo-Vaca were jointly liable for the refund obligations, estimated to exceed $ 1.6 billion. On December 26, 1977, Coastal, Coastal Producing, Lo-Vaca, and Lo-Vaca's customers reached agreement on the Settlement Plan. On or about December 26, 1977, the settling parties filed motions with the Railroad Commission requesting a rehearing of its December 12, 1977, order. On March 10, 1978, the Railroad Commission granted the motions for rehearing and vacated *145 its December 12, 1977, order. On August 7, 1978, the Railroad Commission indicated that, subject to certain conditions, it would issue a final order authorizing a new rate structure for Lo-Vaca under the Settlement Plan. On September 4, 1979, the Railroad Commission issued the new order, which became final on October 1, 1979. The Settlement Plan
The Settlement Plan provided that (a) all pending or threatened claims of settling customers against Coastal, Coastal Producing, and Lo-Vaca, including breach of contract claims pending in Texas courts, would be released or dismissed; (b) the prices under Lo-Vaca's contracts with its customers would be increased so that Lo-Vaca could continue as a viable company; (c) Coastal Producing would be renamed Valero, and would be spun off from Coastal by the distribution of 86.6 percent of its outstanding common stock to Coastal's shareholders, except Oscar Wyatt, Coastal's Chairman of the Board and Chief Executive Officer; (d) Valero would transfer its refined products, crude oil, gas, and oil exploration and production operations to Coastal; (e) Coastal would transfer its Rio Grande Valley Gas Co. Division and certain undeveloped Texas *146 lignite leases to Valero; (f) Coastal would assume $ 76.6 million of Valero's long-term debt; (g) Coastal would issue 940,410 shares of its series D preferred stock to Valero in satisfaction of intercompany balances; and (h) a trust would be established for the benefit of the settling customers (the Settlement Trust). [5]
The Settlement Plan also provided that, on the settlement date, Valero would deliver to the Settlement Trust the remaining 13.4 percent of its outstanding common stock, an $ 8 million promissory *147 note of Valero payable to the trustee in 1 year, Coastal common stock having a book value of $ 20,835,000, and 1.15 million shares of newly issued Valero series A preferred stock. Valero's Certificate of Incorporation provided that the series A preferred stock had a cumulative annual dividend of $ 8.50 per share and a liquidation value of $ 100 per share, and required its redemption, commencing December 1, 1986, at the rate of 57,500 shares per year, at a price of $ 100 per share. [6] However, section 4.02 of the Settlement Plan also included Coastal's and Valero's contractual assurances to the settling customers that the Settlement Trust would realize at least $ 115 million, on or before April 29, 1988, from the sale or redemption of and dividends on the 1.15 million shares of Valero series A preferred stock. The Settlement Plan provided no such assurances with respect to the amounts to be realized on the disposition or payment of any of the other assets that were to be transferred to the Settlement Trust. *148 During the negotiations leading to the Settlement Plan, the customers had demanded a cash settlement. When it became clear that Valero could not raise the cash needed to settle the case, the settling customers agreed to accept stock and other negotiable paper of Valero and Coastal. Although the settling customers favored receiving preferred stock as part of the settlement package, they generally were unwilling to take stock that was not publicly traded. Accordingly, when the Valero series A preferred stock was to be included in the settlement package, the settling customers were unwilling to accept the proposal without receiving contractual assurances from Coastal and Valero on the amount they would realize therefrom. Coastal initially refused to give the customers any such assurance. However, after it became obvious that the customers would not agree to the Settlement Plan without such assurance, Valero offered to indemnify Coastal for any payments that Coastal would be required to make in satisfaction of that obligation, and Coastal agreed to provide the necessary assurance. Section 4.02 of the Settlement Plan accordingly provided, under the Escrow Agreement incorporated *149 in the Settlement Plan, that an escrow agent would hold the Coastal series D preferred stock issued to Valero and other assets deposited by Coastal and Valero until the Settlement Trust realized at least $ 115 million from the sale or redemption of and dividends on the Valero series A preferred stock. The Settlement Trust agreement incorporated in the Settlement Plan provided that the trustee would use its best efforts to sell all Settlement Trust securities, including the Valero series A preferred stock, for cash, at the highest prices reasonably obtainable, no later than December 31, 1986. [7] However, if, on April 29, 1988, the trustee still retained any Valero series A preferred stock, the trustee was to deliver such stock to the escrow agent. *150 On April 29, 1988, or such earlier date by which the trustee had sold or otherwise disposed of all the Settlement Trust's Valero series A preferred stock, the trustee was to certify to the escrow agent the total proceeds received by the Settlement Trust from the disposition of and dividends on such stock. If the total proceeds received by the Settlement Trust from the series A preferred stock were less than $ 115 million, the escrow agent was to make up the difference using funds that Valero or Coastal had deposited with the escrow agent. [8] Should Coastal funds be used to pay the trustee, Valero was to deliver to the escrow agent a 10-year promissory note payable to Coastal having a face amount equal to the Coastal funds used to pay the trustee and bearing an annual interest rate of 6 percent, or $ 8.50 nonvoting Valero preferred stock having an aggregate liquidation value equal to the Coastal funds used to pay the trustee. *151 Coastal and Valero also entered into a tax deconsolidation agreement as part of the Settlement Plan. The tax deconsolidation agreement provided that Coastal would claim, on its 1979 consolidated income tax return, a $ 115 million deduction "with respect to the payment of * * * [Valero series A preferred stock] to the Trustee", and that in return therefor, Coastal would pay Valero $ 50 million in respect of the tax benefit resulting from the deduction. On April 27, 1978, Coastal requested a private letter ruling from respondent on the tax consequences under section 355 of the Valero spinoff and related transactions. On September 20, 1978, respondent issued the requested ruling. On May 25, 1979, Coastal requested a supplemental ruling on the section 355 issue because of amendments to the Settlement Plan. Coastal, at the request of respondent, included in its supplemental ruling request information about the tax deconsolidation agreement between Coastal and Valero. The supplemental ruling request stated that Coastal would claim, on its 1979 consolidated income tax return, a $ 115 million deduction, "the fair market value of [the Valero series A preferred] stock". On July 6, 1979, *152 respondent issued a supplemental letter ruling to Coastal, to the effect that the amendments to the proposed transaction would have no adverse effect on the ruling previously issued. However, no opinion was requested by Coastal or expressed in either the private letter ruling or the supplemental letter ruling on the allowability of the $ 115 million deduction or the value of the Valero series A preferred stock. Implementation of the Settlement Plan
On December 31, 1979, Coastal Producing was renamed Valero and was spun off from Coastal. Valero transferred to the Settlement Trust 13.4 percent of Valero's then-outstanding common stock, an $ 8 million promissory note of Valero payable to the trustee in 1 year, and 793,596 shares of Coastal common stock. Valero also turned over to the trustee 1.15 million shares of Valero series A preferred stock having a liquidation value of $ 115 million and a fair market value, as stipulated in this case, of $ 89,125,000. In 1981, the trustee notified Valero that it intended to sell 230,000 shares of the Valero series A preferred stock. Valero chose not to exercise its right of first refusal with respect to this sale and, on December 30, *153 1981, the trustee sold 230,000 shares of the Valero series A preferred stock to Variable Annuity Life Insurance Co., an unrelated party, for $ 12,420,000, or $ 54 per share. In December 1982 and January 1983, the trustee notified Valero that it intended to sell an additional 460,000 shares, 230,000 shares on each occasion, of Valero series A preferred stock. Valero exercised its right of first refusal with respect to these sales. On August 31, 1983, Valero purchased from the trustee 460,000 shares of the series A preferred stock for $ 34,040,000, or $ 74 per share. Valero financed this purchase with the proceeds of a public offering of a second series of preferred stock. The trustee, at the closing of the August 1983 sale, notified Valero that it intended to sell the remaining 460,000 shares of Valero series A preferred stock at a price of $ 71.87 per share. The trustee gave Valero additional notices of its plans to sell the remaining series A preferred stock in November 1983, February 1984, April 1984, and July 1984. The respective sales prices stated in the November, February, April, and July notices were $ 72, $ 62.96, $ 52.50, and $ 37 per share. [9] Valero objected to each *154 of these notices on the ground that the trustee had failed to comply with the Settlement Trust agreement in issuing the notices. The trustee filed suit against Valero, claiming that Valero was improperly preventing the trustee from selling its remaining Valero series A preferred stock. On August 3, 1984, Valero and the trustee settled their dispute. Valero and the trustee agreed that the escrow agent would pay $ 34,055,972 to the Settlement Trust and that, in return therefor, the Settlement trust would transfer its remaining 460,000 shares of series A preferred stock to Valero. Of the $ 34,055,972 paid to the Settlement Trust, $ 14,260,000 was the purchase price of the 460,000 shares of Valero series A preferred stock (at $ 31 per share), and $ 19,795,972 was the amount due the Settlement Trust from Valero by reason *155 of its assurance that the Settlement Trust would realize at least $ 115 million from the disposition of and dividends on the 1.15 million shares of Valero series A preferred stock it had received in 1979. Valero paid the full $ 8.50 cumulative dividend on its series A preferred stock each year to the extent that it had remained outstanding. Coastal's and Valero's Tax Treatment of the Transactions
Coastal claimed, on its 1979 consolidated income tax return, a $ 115 million deduction with respect to "issuance of preferred stock pursuant to the settlement agreement". Coastal, under the tax deconsolidation agreement, paid Valero $ 50 million in respect of the tax benefit resulting from the $ 115 million deduction. Valero also reported, and Coastal claimed, on its 1979 consolidated income tax return, deductions of $ 35,643,740, $ 18,649,506, and $ 8 million with respect to Valero's distribution of 13.4 percent its common stock to the Settlement Trust, Valero's contribution of Coastal common stock to the Settlement Trust, and Valero's transfer of its $ 8 million promissory note to the Settlement Trust. Valero deducted, on its 1984 consolidated Federal income tax return, the *156 $ 19,795,972 payment it made to the trustee in satisfaction of its obligation to the settling customers. Although the statutory period for assessing a deficiency in 1979 Federal corporation income tax against Coastal had not expired when respondent's agent was examining Valero's 1984 consolidated income tax return, the statutory period for assessing a deficiency in tax for Coastal's 1979 taxable year expired on June 30, 1990. When respondent's agent was examining Valero's 1984 return, he knew that the statutory period for assessing a deficiency in 1979 corporate income tax against Coastal had not expired and that Coastal's 1979 consolidated income tax return was being reviewed by respondent's Appeals Office. OPINION We stress at the outset that the primary issue posed and argued by the parties was not whether the Valero series A preferred stock was stock or debt, but whether there were one or two liabilities with respect to the series A preferred stock. As a result, questions concerning the character of the preferred stock for tax purposes, including the allowability, to corporate nonmunicipality holders, of the dividend received deduction with respect to dividends on the preferred *157 stock, and of the tax significance of the use of preferred stock redemption proceeds and dividends to satisfy a contractual obligation, are not before us. Cf. Arthur R. Jones Syndicate v. Commissioner, 23 F.2d 833 (7th Cir. 1927), revg. and remanding 5 B.T.A. 853 (1926); McCoy-Garten Realty Co. v. Commissioner, 14 B.T.A. 853 (1928). Deductibility of Valero's 1984 Cash Payment
Respondent contends that petitioner overstated its 1984 net operating loss by $ 19,795,972. Respondent argues that, in 1979, Coastal had accrued and deducted the entire amount of Valero's and Coastal's obligation to the settling customers, including any future payments that might be required by their assurances to the customers that they would realize at least $ 115 million from the Valero series A preferred stock. Respondent argues that Valero's 1984 payment to the Settlement Trust was the last payment made on that obligation, and that Valero's 1984 deduction of that payment is an improper double deduction of an amount included in the amount of an accrual previously deducted on Coastal's 1979 consolidated income *158 tax return. Respondent further argues that the duty of consistency precludes Valero from taking a 1984 deduction for its 1984 payment to the Settlement Trust. Valero argues that it incurred two separate liabilities with respect to the series A preferred stock under the Settlement Plan: (a) a fixed obligation to transfer 1.15 million shares of Valero series A preferred stock to the Settlement Trust on the settlement date; and (b) a contingent obligation to make a future cash payment to the trustee if the Settlement Trust did not realize at least $ 115 million from the disposition of and dividends on the series A preferred stock. Valero argues that the $ 115 million deduction taken on Coastal's 1979 consolidated income tax return related solely to Valero's obligation to transfer 1.15 million shares of its series A preferred stock to the Settlement Trust. Valero argues that its obligation to make a future cash payment was not fixed until 1984 and that it therefore could not accrue and deduct this obligation prior to 1984. Valero also argues that the duty of consistency does not preclude it from taking a 1984 deduction for its 1984 payment to the Settlement Trust because it has not *159 attempted to change any prior representations made to respondent about Coastal's $ 115 million deduction claimed and allowed for 1979. Taxpayers generally must allocate income and expenses to a particular taxable year in accordance with the method of accounting they use in regularly maintaining their books. [10] Sec. 446(a); sec. 1.446-1(a)(1), Income Tax Regs.; see also Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 30-31 (1988). Thus, where the taxpayer uses an accrual method of accounting, an expense is deductible in the first taxable year in which (1) all events establishing the liability have occurred, and (2) the amount of the liability can be determined with reasonable accuracy. Sec. 1.461-1(a)(2), Income Tax Regs.; see also United States v. Hughes Properties, Inc., 476 U.S. 593, 600 (1986). Although deduction is premature where the existence of the liability is subject to conditions precedent or other contingencies, United States v. Hughes Properties, Inc., supra at 600, "when the liability itself is fixed * * * other uncertainties do not necessarily destroy that initial certainty", *160 Washington Post Co. v. United States, 186 Ct. Cl. 528, 405 F.2d 1279, 1284 (1969); see also Lukens Steel Co. v. Commissioner, 52 T.C. 764, 785 (1969), affd. 442 F.2d 1131 (3d Cir. 1971). It is therefore the certainty of the liability that is paramount, not the certainty of the time over which payment will be made, the identity of the payees, or the manner in which payment will be made. Washington Post Co. v. United States, supra at 1284; Lukens Steel Co. v. Commissioner, supra at 786. The parties agree that these legal principles govern the accrual of Valero's obligations under the Settlement *161 Plan for Federal income tax purposes. The parties, however, disagree on what liability or liabilities were created by the Settlement Plan. [11] *162 We agree with respondent that Valero incurred one liability, rather than two liabilities, upon its transfer of 1.15 million shares of its series A preferred stock to the Settlement Trust and its undertaking that the Settlement Trust would receive at least $ 115 million from the dividends on and disposition of such stock. This is because Valero's transfer of the 1.15 million shares of its series A preferred stock to the Settlement Trust was in support of the liability that it incurred to assure that the Settlement Trust would realize no less than $ 115 million from the dividends on and disposition of those shares. [12]
Although Valero argues that its obligation under the assurance provision of the Settlement Plan [13] *164 was not part of the liability accrued and deducted on Coastal's 1979 consolidated income tax return, the record shows *163 the contrary. The Settlement Plan was intended to be and had the effects of an integrated agreement, resolving all pending or threatened claims against Lo-Vaca, Valero, and Coastal and discharging them from their joint refund liability to the settling customers. Because Valero did not have sufficient cash on hand to settle the customers' claims, it undertook to pay $ 115 million to the customers, over an 8-year period, using the dividend, sale, and redemption proceeds from the series A preferred stock that it would issue to the Settlement Trust. [14]
The provisions of a certificate of incorporation do not create debt or contractual assurances that dividend, redemption, and liquidation provisions of preferred stock will be honored in accordance with their terms; they are subject to future action of the board of directors and the continued existence of capital and surplus. See, e.g., Solomon et al., Corporations Law and Policy 220 (2d ed. 1988). Therefore the proceeds that can be expected from preferred stock are contractually uncertain and speculative, as compared with a debt obligation. See Snyder v. Commissioner, 93 T.C. 529, 546 (1989). The purpose of the assurance provision was to create a contractual obligation that the customers would receive $ 115 million from Valero. The assurance provision therefore did not render contingent *165 the amount of the liability to be paid under the Settlement Plan, but instead provided assurance that this amount ultimately would be paid to the settling customers. Valero points to various facts in support of its argument that its transfer of the series A preferred stock and its assurance that the Settlement Trust would realize at least $ 115 million in proceeds were two distinct liabilities: These obligations were created by separate provisions of the Settlement Plan; and the assurance provision was negotiated after the settling parties had agreed in principle on the other provisions of the Settlement Plan. Valero, in so arguing, has placed too much emphasis on the temporal sequence in which the various elements of the Settlement Plan were tentatively agreed to during negotiations before the Settlement Plan was finalized and became binding. Lo-Vaca's customers would not have settled their claims or released Valero from its refund liability without a comprehensive agreement, including the assurance provision. Thus, in the absence of the assurance provision, there could not have been a Settlement Plan and there would have been no agreement. Accordingly, Valero's assurance that *166 the settling customers would realize at least $ 115 million in proceeds from the series A preferred stock was an integral part of a unified plan and agreement that settled all claims against Lo-Vaca, Valero, and Coastal. It therefore would be erroneous to consider each payment provision of the Settlement Plan as a separate liability. Cf. Washington Post Co. v. United States, 405 F.2d at 1283 (although plausible, misleading to view each relationship created under the taxpayer's incentive plan as a separate liability). Valero argues that a decision for respondent on this issue would be inconsistent with our holding in Nestle Holdings, Inc. v. Commissioner, 94 T.C. 803 (1990). In that case, an accrual basis taxpayer that was discontinuing a line of business sold a portion of its inventory to an unrelated corporation in exchange for the latter's preferred stock. Id. at 804. The taxpayer, in the same taxable year, sold the preferred stock to its parent corporation for cash equaling the fair market value of the preferred stock. Id. at 806. The *167 taxpayer, arguing that it only realized an amount equal to the fair market value of the preferred stock, reported, on its income tax return, a loss on the partial sale of its inventory to the third party. Id. The Commissioner disagreed and argued that, for purposes of section 1001(b), the taxpayer realized an amount equal to the redemption price of the stock because the taxpayer would have been entitled to receive at least this amount under the preferred stock's mandatory redemption feature. Id. at 807. We agreed with the taxpayer because, under applicable law, the preferred stock's mandatory redemption feature was unenforceable if the issuing corporation did not have adequate capital or equity. Id. at 813. We therefore held that the taxpayer's gross income did not include amounts it was "guaranteed" to receive under the mandatory redemption feature because the "holder of * * * preferred stock has no unconditional right to receive all or any part of the redemption price." Id. at 814. Accordingly, there was no ground on which the Commissioner could properly support her attempt to *168 impose an accrual of income on the taxpayer. See, e.g., Snyder v. Commissioner, supra.
The case at hand is distinguishable from Nestle Holdings. Under the Settlement Plan, Valero did not give its assurance that it would pay dividends on or redeem its series A preferred stock. Rather, Valero assured the settling customers that, on or before April 29, 1988, the Settlement Trust would realize at least $ 115 million from any combination of dividends on and proceeds of disposition of series A preferred stock, and if not, that Valero would make up any shortfall. The settling customers therefore had a contractual right, legally enforceable in 1979, to receive the full $ 115 million, and that right was not subject to the availability of sufficient capital and surplus needed to redeem and pay dividends on the series A preferred stock. Accordingly, the deduction claimed and allowed on Coastal's 1979 consolidated income tax return included any subsequent payment that Valero might become obligated to make in satisfaction of the assurance provision of the Settlement Plan. [15] Valero therefore is not entitled to deduct, for 1984, the $ 19,795,972 payment *169 it made to fulfill its obligation under the assurance provision. In light of our holding, we need not address respondent's other arguments on this issue, including her argument that the duty of consistency, as applied by the Court of Appeals for the Fifth Circuit in such cases as Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986), precludes petitioner from deducting the $ 19,795,972 payment in 1984. Respondent's Tax Benefit Argument
Respondent contends, by way of amendment to the answer requested 2 weeks before trial, that Valero's *170 1984 gross income should be increased by an additional $ 6,079,028. Respondent argues that Valero discharged its liability to the settling customers by transfers to the Settlement Trust of stock and cash in the aggregate amount of $ 108,920,972. The thrust of respondent's new contention is that Valero must increase its gross income for 1984, the year in which Valero fulfilled its obligation under the Settlement Plan, by $ 6,079,028, the amount by which the $ 115 million deduction taken by Coastal on its 1979 consolidated income tax return exceeded the sum of the $ 19,795,972 payment made by Valero in 1984 and $ 89,125,000, the fair market value of the 1.15 million shares of Valero series A preferred stock that Valero transferred to the Settlement trust in 1979. With this argument, respondent is, in effect, backing away from her original primary argument -- which we have already accepted -- that the obligation Valero incurred, accrued, deducted, and was allowed for 1979, was to pay $ 115 million to the Settlement Trust, using the proceeds from the dividends on and disposition of its series A preferred stock, and to make up any shortfall. Whether Valero had additional income of *171 $ 6,079,028 is new matter that respondent first raised by amending the answer. Respondent therefore has the burden of proof on this issue. Rule 142(a). However, in light of our holding on the first issue, our decision on this newly raised issue does not turn on allocation of the burden of proof. The tax benefit rule is a judicially created doctrine designed to alleviate some of the inflexibilities of the annual accounting concept. Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370, 377 (1983); Frederick v. Commissioner, 101 T.C. 35 (1993). Proper application of the tax benefit rule achieves transactional parity by safeguarding the Government and the taxpayer from the adverse effects of transactions having been reported on the basis of assumptions that later prove to be erroneous. Hillsboro Natl. Bank v. Commissioner, supra at 383. The tax benefit rule's inclusionary component provides that an amount deducted from gross income in one year is included in gross income in a subsequent year if an event fundamentally inconsistent with the prior deduction occurs in the subsequent year. Frederick v. Commisioner, supra at 41; *172 see also Hillsboro Natl. Bank v. Comissioner, supra at 383. However, no amount is included in gross income if a nonrecognition provision of the Internal Revenue Code prevents inclusion or the current event would not have foreclosed the deduction had it occurred in the year the deduction was taken. Fredericks v. Commissioner, supra at 41; see also Hillsboro Natl. Bank v. Commissioner, supra at 383-384. Respondent has not shown that the tax benefit rule applies to the case at hand. There is no evidence in the record that an event inconsistent with Coastal's 1979 deduction occurred in a subsequent year. [16] To the contrary, Valero paid the full $ 8.50 cumulative dividend on its outstanding series A preferred stock each year, redeemed 920,000 shares of the series A preferred stock at various times at their then fair market values, and made up the resulting shortfall by means of a cash payment of $ 19,795,972. In sum, by the close of 1984, Valero had fully complied with the Settlement Plan's provisions and completed its discharge of the $ 115 million liability to the settling customers that it had created *173 by its contractual undertaking in 1979. Respondent also has not shown that Valero paid the settling customers less than $ 115 million. Respondent now argues that Valero made two payments to the Settlement Trust with respect to the series A preferred stock: (1) The 1979 transfer of 1.15 million shares of Valero series A preferred stock, and (b) the 1984 cash payment of $ 19,795,972. However, under the Settlement Plan, the settling customers were not paid with Valero series A preferred stock. Rather, the settling customers were to be paid from the dividends on the series A preferred stock held by the Settlement Trust and the proceeds received when the Settlement Trust disposed of the series A preferred stock. See supra pp. 19-20. Valero therefore paid *174 the settling customers $ 115 million, consisting of the $ 19,795,972 cash payment and $ 95,204,028 in dividends on and proceeds from the disposition of the series A preferred stock, all in accordance with and pursuant to the accrual of the $ 115 million deduction for 1979. We therefore hold that Valero did not overstate its 1984 net operating loss by an amount in excess of the $ 19,795,972 that we have determined to be part of the amount that Coastal accrued and deducted on its 1979 consolidated income tax return. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. On or about Dec. 31, 1979, Lo-Vaca was renamed Valero Transmission Co., one of the affiliated group of corporations that comprise petitioner in the case at hand.↩
2. Prior to 1980, Valero's corporate name was Coastal States Gas Producing Co.↩
3. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. The Railroad Commission has original jurisdiction over the rates, rules, regulations, and conditions of service of pipelines selling natural gas to utilities that distribute natural gas to the public. Tex. Rev. Civ. Stat. Ann. art. 1446(c), sec. 19(b)↩ (West 1980).
5. A summary of the offer of settlement sent to the settling customers stated that the trustee, after the settlement date, would request a ruling from respondent that the Settlement Trust was a "grantor" trust, although the record does not indicate whether the trustee requested any such ruling from respondent. The summary further stated that if the Settlement Trust was a "grantor" or "simple" trust for Federal income tax purposes, the income of the Settlement Trust would be taxable to the settling customers.↩
6. Valero also had the right to redeem any or all outstanding shares of the series A preferred stock, in excess of those shares it was required to redeem, at a redemption price of $ 110 per share before Nov. 30, 1985, such amount to be reduced by 50 cents per share for each year thereafter to a minimum of $ 100 per share.↩
7. Sec. 3.04(q) of the Settlement Trust agreement gave Valero a right of first refusal to purchase any shares of its Series A preferred stock that the trustee proposed to sell, at the price and in the amount proposed by the trustee. Sec. 3.03 of the Trust agreement also restricted the trustee from selling more than 20 percent of the Valero series A preferred stock during any of the 3 years immediately following the settlement date. However, the Settlement Trust agreement did provide for an exception to this limitation if there was a reasonable expectation that the net proceeds from the sale would equal or exceed 85 percent of the stock's aggregate liquidation value.↩
8. No payment was due from the escrow agent if the Settlement Trust received at least $ 115 million in proceeds on the series A preferred stock. Nor was the Settlement Trust to pay to the escrow agent any proceeds it received with respect to the series A preferred stock in excess of $ 115 million. Rather, the Settlement Trust was to include any such excess proceeds in the amounts that it would distribute to the settling customers.↩
9. The fair market value of Valero securities declined substantially between August 1983 and August 1984. By Aug. 3, 1984, the fair market value of Valero Series A preferred stock was $ 31 per share.↩
10. Taxpayers are not permitted to allocate income and expenses in accordance with their regular method of accounting if that method of accounting does not clearly reflect income. Sec. 446(b); Ford Motor Co. v. Commissioner, 102 T.C.    ↩ (1994).
11. "Liability" is an "accordion word" capable of expanding or contracting in its connotations in a variety of contexts. Erickson v. Grande Ronde Lumber Co., 92 P.2d 170, 174 (Or. 1939); Texas Industrial Accident Bd. v. Allstate Ins. Co., 570 S.W.2d 201, 203 (Tex. Ct. App. 1978); cf. Hohfeld, "Some Fundamental Legal Conceptions as Applied in Judicial Reasoning", 23 Yale L.J. 16, 53-54 (1913). However, the primary factor in construing a "liability", memorialized in writing, is the intent of the obligee and obligor as indicated by that writing. Cf. Dodson v. Stevens Transport, 776 S.W.2d 800, 805↩ (Tex. Ct. App. 1989) (in construing the terms of a contract, well-established rules of construction provide that overriding consideration be given to the intention of the parties as manifested in the contract).
12. If, as Valero argues, the $ 115 million deduction related solely to its transfer of the 1.15 million shares of series A preferred stock, the proper amount of the 1979 deduction would have been $ 89,125,000, the stipulated fair market value of the stock at the time the transfer was completed, and not its liquidation value. See Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 283↩ (1979). However, Coastal and Valero took the position, in the ruling request and on the Coastal 1979 consolidated income tax return, that the Valero series A preferred stock had a value of $ 100 per share, $ 115 million, for this purpose, thereby creating some ambiguity as to whether the $ 115 million deduction was properly based on the accrual of a contractual obligation to make future payments or on the value of the preferred stock transferred to the Settlement Trust.
13. The parties frequently refer to the assurance provision of the Settlement Plan as Valero's "guarantee" to the settling customers. However, the usual connotation of "guarantee" is that of a secondary obligation to pay in the event of default by the principal obligor. See Black's Law Dictionary 705 (6th ed. 1990). In the case at hand, Valero had a primary obligation to assure that $ 115 million would be realized by the Settlement Trust in respect of the 1.15 million shares of Valero series A preferred stock by making up the difference between $ 115 million and the amount the Settlement Trust received from the dividends on and disposition of the 1.15 million shares of Valero series A preferred stock.↩
14. Inasmuch as the parties have not raised any issue with respect to other paper issued or transferred under the Settlement Plan, we limit our discussion to the series A preferred stock and the $ 115 million that the settling customers were assured to receive with respect thereto.↩
15. Inasmuch as Coastal's 1979 tax year is not before us, we express no opinion as to whether the $ 115 million deduction claimed on that tax return clearly reflected Valero's income as required by sec. 446(b). Cf. Ford Motor Co. v. Commissioner, 102 T.C.    ↩ (1994). In any event, the full $ 115 million deduction was not only claimed but allowed on that return.
16. There also is no evidence that Valero has attempted to change Coastal's representation, on its 1979 consolidated income tax return, that the $ 115 million deduction was "with respect to the payment of * * * [Valero series A preferred stock] to the Trustee".↩